# NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

# NEW YORK–KEANSBURG–LONG BRANCH BUS CO., INC., Respondent.

No. 77–1691.

United States Court of Appeals, Third Circuit.

Argued Feb. 16, 1978.

Decided May 1, 1978.

Elliott Moore, Deputy Associate Gen. Counsel, John D. Burgoyne, Asst. Gen. Counsel, Chris W. Katzenbach, Attys., National Labor Relations Board, Washington, D. C., for petitioner.

John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Assoc. Gen. Counsel, Francis A. Mastro, Apruzzese & McDermott, Springfield, N. J., for respondent.

Before SEITZ, Chief Judge, ROSENN and GARTH, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge.

The National Labor Relations Board (Board) has petitioned this court to enforce its order directed against the New York-Keansburg-Long Branch Bus Co., Inc. (Company). Among the unfair labor practices found by the Board was a refusal by

the Company to execute a collective bargaining contract after it had allegedly reached agreement with the Union. Finding no substantial evidence in the record that a substantive accord had been reached, we cannot agree that the Company has committed the unfair labor practices charged. We will therefore deny enforcement of the Board's order.

## I

On June 26, 1975, Local 701 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America (Union) filed a charge with the Board, alleging that the Company had refused to bargain in good faith in violation of sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act (Act).[1] On October 9, 1975, the Union filed a second charge, complaining that the Company refused to reemploy striking workers, in violation of sections 8(a)(1) and 8(a)(3) of the Act.[2] A hearing was held on the consolidated charges. On October 20, 1976 the Administrative Law Judge (ALJ) issued his decision and order,[3] finding violations of sections 8(a)(1), (3) and (5) of the Act.[4] Specifically, the ALJ found three unfair labor practices:

(1) a refusal by the Company to execute an agreement "embodying the terms and conditions of employment on which the Respondent [Company] and the Union had reached agreement in December 1974";

(2) a refusal by the Company to contribute to the Union's Welfare and Pension Fund; and

(3) a refusal by the Company to reinstate certain striking employees.
(A16).

To remedy these violations, the ALJ ordered, *inter alia*, (1) execution of the collective-bargaining agreement; (2) payment of all pension and welfare funds due; and (3) reinstatement of all striking workers, with back pay. (A17–18(a)).

On April 5, 1977, the Board summarily affirmed the ALJ's rulings, findings and conclusions and adopted his recommended order.[5] The Board then petitioned this court for enforcement.

## II

The Company is an interstate carrier providing bus service principally between Leonardo, New Jersey and the Port Authority Terminal in New York. The Union represents the Company's full-time bus drivers. Upon the expiration of their collective bargaining agreement in September, 1973, the Company and the Union continued negotiations (which had begun on July 31, 1973) for a new agreement. By late 1973, both parties had agreed to all contract terms but

---

1. 29 U.S.C. §§ 158(a)(1), (5).

2. *Id.* §§ 158(a)(1), (3).

3. Reproduced in the Appendix at A1–19.

4. The ALJ dismissed charges that the Company had bargained directly with its employees and committed other acts of restraint and coercion in violation of § 8(a)(1). The ALJ also required deletion of certain illegal provisions found in the contract. These rulings are not disputed on this appeal.

5. Decision and Order dated April 5, 1977, 228 NLRB No. 161, *reproduced at* A20–21.
   In *Kenworth Trucks of Philadelphia, Inc. v. NLRB*, 580 F.2d 55 (3d Cir. 1978), *petition for panel rehearing granted* (3d Cir. 1978), this Court said:
   It might be said that [the] ends [of predictability and accountability in administrative decision-making] can just as well be served by only having the ALJ fully set forth his reasons, and by allowing the NLRB simply to ratify what the ALJ had said. However, this Court has already rejected such a position in its recent decisions, and in addition the suggestion would appear to be unpersuasive. The ultimate authority in the area of the NLRB's activity is, of course, the Board itself, not the ALJ. What is warranted is some guarantee that the NLRB, not just the ALJ, has carefully considered and sifted the evidence of unfair labor practices in determining whether the remedy of a bargaining order is needed.
   *Id.* at —— (footnote omitted). While we recognize that this case does not involve an order to bargain, it is apparent that had the Board approached the ALJ's decision from the *Kenworth* perspective, "carefully consider[ing] and sift[ing] the evidence of unfair labor practices," the instant proceeding before us might have been rendered unnecessary.

three: (1) minimum work force; (2) the terminal or end points of the normal round-trip bus run; and (3) a proposed waiver by the Union of representation of part-time drivers. It is at this point that the parties' respective versions of the facts sharply diverge.

The Union contends that ultimately the parties reached full and complete agreement on a contract.[6] The Union asserts that the parties agreed upon the following terms: (1) the Company would maintain a minimum full-time work force of the *greater* of thirty-five (35) drivers or a number totalling three above the number of "posted [or line] runs" maintained on the Company work board (work force provision);[7] (2) the normal round trip would begin and end at Leonardo, New Jersey, not at Long Branch, New Jersey (a point fifteen miles further south) (Leonardo-to-Leonardo provision);[8] and (3) *after* execution of the contract, the Union would furnish a letter to the Company in which it agreed that it would not represent part-time drivers during the life of the contract (waiver provision). The Union further contends that the Company refused nonetheless to reduce this "agreement" to a final writing or to otherwise execute the contract.

The Company responds that the parties never reached a full and final agreement on the terms of the contract (A3). Referring specifically to the three substantive provisions of the agreement noted above, the Company makes these contentions. First, the Company maintains that the parties could not, and did not, reach agreement on the number of drivers constituting the full-time work force. The Company claims that it agreed to maintain only a force which totaled three above the number of posted runs, with *no* minimum guarantee of thirty-five drivers. Second, the Company asserts that it consistently and vehemently opposed the inclusion of any Leonardo-to-Leonardo provision in the contract (A7).[9] Finally, the Company claims that after the Union rejected the Company's version of the waiver letter pertaining to part-time representation (A7), the parties at no time thereafter agreed to or drafted the relevant provision.[10] In this connection the Company points out that the parties also failed to agree on the time that the waiver letter would be executed, as the Company insisted that it be executed contemporaneously with, and incorporated into, the collective bargaining contract.[11]

The ALJ and the Board credited the Union's testimony and contentions. The ALJ found that the parties reached "full agreement on the terms of a new contract" at "the January 14, 1974 negotiation meeting" (A11).[12] The precise contract terms found by the ALJ include the Union's version of the three contested provisions discussed above. Yet, despite this finding, it is undisputed that the contract submitted to the Union contained the Company's and not the Union's version of the work force provi-

---

6. Inasmuch as the date on which this purported agreement was reached becomes highly relevant in terms of our analysis of the "agreement", the details and dates of the parties' actions as they relate to a completed contract are discussed in a subsequent portion of this opinion.

7. A posted or line run consists of two round-trip bus rides between Leonardo and New York—apparently the daily work requirement of one full-time bus driver.

8. The Union subsequently dropped its insistence that this term be expressed in the contract; hence as the ALJ found, it was not included in the final version of the contract. (A11).

9. *See* n.8 *supra.*

10. The ALJ found that the waiver letter would be forthcoming from the Union after the Company executed the final contract—a step the Company contends it could never take. (A7).

11. Under *Briggs Indiana Corp.*, 63 N.L.R.B. 1270 (1945), and *Allis-Chalmer Mfg. Co.*, 179 N.L.R.B. 1 (1969), the Board will recognize a contractual provision in which the Union agrees to waive representation of certain employees during the duration of the collective bargaining agreement.

12. This agreement was to be executed effective March 1, 1974. (A11).

sion.[13] Nor did this "full agreement" which ultimately gave rise to the unfair labor practice charge against the Company contain a waiver of part-time representation or a provision as to the end points of the normal round-trip bus run.

It was not surprising therefore that the ALJ found that a *new* full and complete agreement had been reached some eleven months later in December, 1974. This later "full agreement" no longer included the Leonardo-to-Leonardo provision (A8). The ALJ determined that this new agreement consisted of all those provisions set forth in a contract drafted and sent by the Company to the Union in December, 1974 (General Counsel's Exhibit 8 (GC 8)), as supplemented by two clauses which to this day have yet to be drawn: an addendum prescribing the minimum work force and a waiver letter to be furnished by the Union upon execution of the contract (A11).

With the contract in this state, the ALJ found that the parties reached a *third* complete agreement in April, 1975. It was then, the ALJ concluded, that "the parties agreed upon the procedure for execution of the contract—the first step [drafting the work force addendum] to be taken by [the Company]" (A12).

The full flavor of the ALJ's findings that a "full agreement" was reached on three different dates (January 14, 1974; December, 1974; and April, 1975) cannot be appreciated without reference to the actual text of his opinion. It reads as follows:

> While I have found that the parties did reach a full agreement on January 14, 1974, the parties continued to negotiate because of the Respondent's [Company's] subsequent contention it had not agreed on the definition of line runs. When the Union acquiesced to the Respondent's language in December 1974, full accord was reached at that time on the terms of a new agreement and the Respondent was to prepare the agreement. The Un-

ion was furnished copies later in December. I have found that the agreement (General Counsel's Exhibit 8) was the complete agreement encompassing the understanding of the parties except that the addendum pertaining to the work board was not included. When this was brought to Rossiter's [the Company's representative's] attention in April 1975 it was agreed that Rossiter would send such addendum to the Union and the parties would then execute the contract. (A12).

It was based on these findings that the Company was charged with having committed unfair labor practices.

## III

The Board's factual findings "conclusive[ly]" bind this Court "if supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e); *accord, Universal Camera Corp. v. NLRB*, 340 U.S. 474, 493, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *NLRB v. W. C. McQuaide, Inc.*, 552 F.2d 519, 533 (3d Cir. 1977); *NLRB v. Armcor Industries, Inc.*, 535 F.2d 239, 242–43 (3d Cir. 1976); *NLRB v. Buitoni Foods Corp.*, 298 F.2d 169, 171 (3d Cir. 1962). However where there is a lack of substantial evidence in the record to support the Board's order, we will deny enforcement.

The thrust of the ALJ's opinion is that the Company had agreed to all the terms and conditions of a collective bargaining agreement negotiated with the Union. Having once found that such an "agreement" existed, the Company was then charged with having refused to sign this "agreement" which, by the ALJ's definition, embodied all the terms and conditions to which the Company and the Union had assented.

We recognize that under traditional contract law if the contracting parties do not intend a contract to become

---

**13.** To justify this seeming contradiction, the ALJ then found that the parties agreed in February, 1974 to attach an *addendum* to the contract which would contain the Union's version

of the work force clause, *i. e.*, the "greater of thirty-five or posted runs-plus-three" language (A7).

effective unless and until reduced to a signed, integrated writing, that intention will be given effect and the contract will not bind either party until the writing is executed. However, we are not dealing here with such a contract. In the field of labor relations when the parties have agreed to the substantive terms and conditions of a contract, even though it may not be reduced to writing, they can nevertheless be held to its terms. *H. J. Heinz Co. v. NLRB*, 311 U.S. 514, 524–26, 61 S.Ct. 320, 325–26, 85 L.Ed 309 (1941). This has been explained by the Supreme Court as follows:

> Before the enactment of the National Labor Relations Act it had been the settled practice of the administrative agencies dealing with labor relations to treat the signing of a written contract embodying a wage and hour agreement as the final step in the bargaining process. .    .
>
> \*    \*    \*    \*    \*    \*
>
> We think that Congress, in thus incorporating in the new legislation the collective bargaining requirement of the earlier statutes included as a part of it, the signed agreement long recognized under the earlier acts as the final step in the bargaining process. It is true that the National Labor Relations Act, while requiring the employer to bargain collectively, does not compel him to enter into an agreement. But it does not follow, as petitioner argues, that, having reached an agreement, he can refuse to sign it, because he has never agreed to sign one. He may never have agreed to bargain but the statute requires him to do so. To that extent his freedom is restricted in order to secure the legislative objective of collective bargaining as the means of curtailing labor disputes affecting interstate commerce. *The freedom of the employer to refuse to make an agreement relates to its terms in matters of substance and not, once it is reached, to its expression in a signed contract,* the absence of which, as experience has shown, tends to frustrate the end sought by the requirement for collective bargaining. A business

man who entered into negotiations with another for an agreement having numerous provisions, with the reservation that he would not reduce it to writing or sign it, could hardly be thought to have bargained in good faith. This is even more so in the case of an employer who, by his refusal to honor, with his signature, the agreement which he has made with a labor organization, discredits the organization, impairs the bargaining process and tends to frustrate the aim of the statute to secure industrial peace through collective bargaining.

*Id.* at 524–26, 61 S.Ct. at 325–26 (footnotes omitted; emphasis added).

■ This teaching is necessarily subject however to the overriding precondition that the parties in the first instance must have agreed to the terms of the contract which is sought to be enforced. *H. K. Porter Co., Inc. v. NLRB*, 397 U.S. 99, 102, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970). It is only a written contract embodying *agreed* terms which the Board may require the company to sign. *H. J. Heinz Co. v. NLRB, supra*, 311 U.S. at 526, 61 S.Ct. 320.

It therefore becomes apparent that the first inquiry to be made is whether, in fact, the parties did agree on the terms and the conditions of the contract. If they did, then plainly an unfair labor practice could be charged against the employer who refused to sign the agreement to which it had assented. However if the substantive terms had not been agreed to by the employer, then of course we may not compel, as the Board may not, the execution of any document.

It is these considerations which must govern our scrutiny of the administrative proceedings in this case. Accordingly, we turn to an examination of the evidence which gave rise to the ALJ's findings and conclusions in order that we might determine its substantiality.

## IV

■ The ALJ made his findings and reached his conclusions by relying almost

exclusively on the testimonial, as distinct from the documentary, evidence presented by certain Union representatives.[14] Even if the ALJ had properly credited this testimony, which we believe he did not not,[15] we would still find that:

the inferences on which [his] findings were based were so overborne by evidence calling for contrary inferences that the findings of the [ALJ] could not, on the consideration of the whole record, be deemed to be supported by "substantial" evidence.

**14.** Testifying in support of the Union's position were Mr. McDermott, Secretary-Treasurer of the Union; Mr. Richard, Union Shop Steward, and Union Bargaining Committee members Mr. Rencoukos and Mr. Schriehofer. Testifying in support of the Company's position were Mr. Rossiter, Company Vice President and General Manager, and Mr. Mackel, a Union Bargaining Committee member.

**15.** In this circuit "[t]he final determination of credibility rests with the Administrative Law Judge *as long as he considers all relevant factors and sufficiently explains his resolutions." NLRB v. W. C. McQuaide, Inc.,* 552 F.2d 519, 526, n.14 (1977) (emphasis added); *accord, Hedstrom Co. v. NLRB,* 558 F.2d 1137, 1142 n.12 (3d Cir. 1977); *NLRB v. Armcor Industries, Inc.,* 535 F.2d 239, 241 n.3 (3d Cir. 1976); *see Altemose Construction Co. v. NLRB,* 514 F.2d 8, 16 (3d Cir. 1975). An analysis of the entire record satisfies us that this standard has not been met in this proceeding.

First, in relying almost exclusively on testimonial evidence to support his decision, the ALJ failed to provide us with the required explanation for his credibility determinations. It is critical to our review that we be furnished with more than generalized characterizations of witnesses who were "honest" (A9), "unconvincing" (A9) or "not impress[ive]" (A6), where no record basis for these characterizations appear. This failure to articulate the basis of a credibility determination is even more disturbing where, as is evident here, substantial discrepancies exist in the testimony of various witnesses who testified in support of the Union's position. *Compare, e. g.,* A509 *with* A5–6 *and with* A510. *See Altemose Construction Co. v. NLRB,* 514 F.2d 8, 13–15 (3d Cir. 1975).

Second, crucial undisputed documentary evidence contained in the record (discussed in detail at pp. 478–480 *infra*) cannot be reconciled with, and completely undermines, the testimony credited by the ALJ. *E. g.,* Respondent's Exhibit 12 (RX 12) Art. XIII, § 8; RX 13 Art. XIII, § 8; General Counsel's Exhibit 11 (*reproduced at* A794); General Counsel's Exhibit 7 (*reproduced at* A748). Yet the ALJ makes

*NLRB v. Pittsburgh Steamship Co.,* 340 U.S. 498, 502, 71 S.Ct. 453, 456, 95 L.Ed. 479 (1951); *see Altemose Construction Co. v. NLRB,* 514 F.2d 8, 13–17 (3d Cir. 1975).

■ Most significant, the undisputed documentary evidence which appears in the record conclusively establishes that no full and complete agreement capable of being executed was ever reached by the parties.

### Minimum Work Force Provision

Each of the three written drafts of the purported collective bargaining agree-

little reference to this evidence in his opinion and in no way attempts to harmonize the documentary evidence with the testimonial evidence. While a fact-finder need not treat with each piece of evidence introduced in the record, *Chalfant v. Wilmington Institute,* 574 F.2d 739, 749–53 (3d Cir. 1978) (en banc) (Garth, J., dissenting), our prior decisions establish that the ALJ as fact-finder must "consider all relevant factors." *Hedstrom Co. v. NLRB,* 558 F.2d at 1142 n.12; *NLRB v. W. C. McQuaide, Inc.,* 552 F.2d at 526 n.14; *Altemose Construction Co. v. NLRB,* 514 F.2d at 13–17; *cf. NLRB v. United Brass Works, Inc.,* 287 F.2d 689, 691 (4th Cir. 1961) ("where material uncontradicted evidence has been ignored, or where evidence has been disregarded or eliminated by the casual expedient of discrediting an employer's witnesses, . . . the Board's finding will not be accorded the presumption of correctness usually attributed to the trier of fact" (citations omitted)).

Lastly, the ALJ's decision reveals a serious internal inconsistency. Six times the ALJ found that the Company and the Union "reached full agreement on the terms of a new contract" on January 14, 1974 (A11, A5, A6, A11, A11, A12). Then the ALJ found that the parties reached a "new" "full accord" in December 1974 (A12, A15, A16). Once again, and this time for statute of limitations purposes, the ALJ found that full agreement was reached in April, 1975, "when the parties agreed upon the procedure for execution of the contract" (A12). In essence therefore the ALJ found that the parties' contract was complete in January, 1974, a "new" contract was complete in December, 1974, but the *real* contract was complete in April, 1975—a date conveniently falling within the six month limitations period established in section 10(b) of the Act, 29 U.S.C. § 160(b). Where, as here, the Union and the Board seek to bind the Company to the precise terms of a collective bargaining agreement, these inconsistent findings render the ALJ's conclusions suspect, and we need not afford our usual deference to his fact-finding.

ment[16] contains a work force provision (Article XIII, Section 8). That provision appears as follows in all three drafts: "the Company shall maintain a [work force] consisting of three (3) men above the number of posted runs" (A767, A837, A813) (*see* A396–400). No writing or mention is to be found in any of the documents which provides for a minimum of thirty-five workers. Nor is there any reference made to any addendum so providing. Despite this, the ALJ found that the parties agreed to an addendum providing for a thirty-five worker minimum *in February, 1974* (A7)—*a date which preceded all three contract drafts*!

Examining the three documents, we observe that on the *Union's* copy of RX 13, the earliest of the three drafts,[17] section 8 of Article XIII (the work force provision) contains one, but only one, handwritten correction.[18] The original typewritten draft had recited that the Company "may" maintain a minimum work force. Thereafter the handwritten word "shall" appears as a substituted verb for the original verb "may" (A837). Next to the clause containing this one interlineation, the Union representative had scrawled "OK". The Union had thereby signified its approval of the Company's work force provision, despite the lack of reference to any minimum number of workers (*i. e.,* thirty-five) or to any addendum so providing.

Even more telling, *on the draft of the contract prepared by the Union in May or June of 1974* (RX 12) (A398), the work force provision (section 8 of Article XIII) reads in its final typewritten form that "[t]he Company shall maintain a [work force] consisting of three (3) men above the num[b]er of

posted runs" (A813). As noted, this is the precise wording of the clause found in RX 13, the draft which had earlier been submitted by the Company to the Union. Here again, no mention is made in this second draft (RX 12) of a minimum of thirty-five workers, or of any addendum.

Similarly, in GC 8, the draft contract drawn by the Company in December, 1974, no change was made to section 8 of Article XIII. That section, which prescribes the requisite full-time work force, appears in the precise form as recited in the two prior drafts. Indeed, on this last draft the Union representative circled the word "shall" on his copy, and penned an "OK" immediately next to it (A767).

On three consecutive contract drafts, therefore, no reference is made to the Union's thirty-five worker provision nor to any addendum which would so provide. Rather on all three drafts both parties had agreed that the Company's obligation was only to "maintain a [work force] consisting of three (3) men above the number of posted runs."

Similarly, two letters which appear in the record provide conclusive evidence refuting the ALJ's finding that the parties had agreed to a minimum of thirty-five full-time bus drivers. On October 8, 1974, with no thirty-five worker provision appearing either in the principal contract draft nor in any addendum to such a draft, the Union wrote to the Company respecting the current status of their contract negotiations.[19] The Union's letter did not refer to any minimum worker provision but only to the Leonardo-to-Leonardo line run provision. Moreover that letter, which is reproduced in full in the margin,[20] explicitly acknowledges

16. General Counsel's Exhibit 8 (GC 8), Respondent's Exhibit 13 (RX 13), & Respondent's Exhibit 12 (RX 12).

17. This entire draft was approved by the Union as evidenced by the notation "OK by Comm.[ittee] 4/30/74 Holiday Inn." (A820, A396–98.)

18. We find this fact significant in that the Union representative freely penned in changes on his contract draft. *See, e. g.,* A823, A832–34, A836.

19. GC 11, *reproduced at* A794.

20. The letter reads in its entirety:
[New York-Keansburg-Long Branch Bus Co., Inc.]
[Mr. Thomas J. Rossiter, General Manager]
Gentlemen:
It is my understanding that we have reached total agreement on the newly negotiated labor agreement with the exception of Article IV, Section 1(b)—"Line Runs". It is our understanding that the wordage should be as follows:
"A line run shall consist of two consecutive round trips with no more than fifteen minutes layover at each end, commencing in

that other than the disputed line run provision, both parties "had reached total agreement" on all aspects of their negotiations. That "total agreement" in the context of the negotiations and the contracts drafted *to that date* necessarily included an agreement on a work force provision which prescribed a minimum number of workers equalling "posted runs plus three," for that is the only language which appears in the three approved contract drafts. This conclusion is substantiated by a second letter sent in November, 1974 from one Union representative to another (GC 7, *reproduced at* A749). That letter recites that save for the Leonardo-to-Leonardo provision, the Union considered the contract to be "complete"—a contract again without a minimum thirty-five worker provision.[21]

No conclusion can be derived from these five uncontroverted documents other than a conclusion that the parties never agreed to a minimum of thirty-five workers. The ALJ nonetheless found that a minimum work force of thirty-five drivers was a sig-nificant feature of the Company's and the Union's integrated and complete contract. Counselled that "[t]he findings of the examiner are to be considered along with the consistency and inherent probability of testimony," *Universal Camera Corp. v. NLRB*, 340 U.S. at 496, 71 S.Ct. at 469; *accord, NLRB v. United Brass Works, Inc.*, 287 F.2d 689, 694 (4th Cir. 1961), we are compelled to conclude that in light of the documentary evidence contained in the record, the testimonial evidence credited by the ALJ and the Board is inherently improbable.[22]

### *Waiver of Part-Time Representation Provision*

Other irrefutable evidence demonstrates that the parties never reached a final collective bargaining agreement which could be executed. The Company, as it promised, prepared a letter whereby the Union agreed to waive representation of part-time drivers during the duration of the contract (RX 9,

Leonardo and terminating in Leonardo, southbound, and shall be compensated at the rate set forth below for each round trip."
It is our understanding that you believe the wordage should be:
"A line run shall consist of two consecutive round trips with no more than fifteen minutes layover at each end and shall be compensated for at the rate below for each round trip."
I am submitting the matter to our attorneys for an opinion with regard to the difference in the language and what procedures to follow. .
Very truly yours,
LOCAL UNION NO. 701
21. That letter reads in its entirety:
Mr. Martin McDermott [Union Secretary-Treasurer]
Local Union # 701
Re: Wording of contract Line Runs
Dear Martin:
On Friday, Nov. 8, 1974, a meeting was held by me with Mr. Thomas Rossiter [Company Vice President] and Drivers, P. Brady, J. Mackel and R. DeVine. Drivers A. Schreihoffer and F. Muller could not make it but have been informed of what transpired and are in agreement.
Mr. Rossiter assured those present that, "If a bus starts out of Long Branch, goes to New York and then returns to Long Branch the driver will receive the Long Branch rate plus the $3.00 for going over the bridge. If the bus goes from Highlands to New York and then goes to Long Branch the driver will be paid the Long Branch rate."
It being the opinion of these 5 drivers that they are satisfied with this meaning of the payment for 1 trip on a line run and that it will apply in the future, you are respectfully requested to withdraw the objection and consider the Contract as complete.
Very truly yours
/s/
John J. Richard
Shop Steward
New York-Keansburg-
Long Branch Bus Company
Agreed to by:
P. Brady /s/    A. Schreihoffer /s/
J. Mackel /s/   F. Mueller /s/
    R. Devine /s/

22. Lurking beneath our discussion is a skepticism that during the seventeen-month period from the date of the first "agreement" of January 14, 1974 up through the filing of an unfair labor practice charge on June 26, 1975, neither party ever reduced to writing a term as crucial to their working relationship and hence to their collective bargaining agreement as the work force minimum of thirty-five full-time bus drivers.

*reproduced at* A798).[23]   Although ostensibly agreeing to the import of the letter, the Union flatly rejected its "legal terminology" (A7, A11).   The ALJ found that:

> Before the [February, 1974] meeting ended, Rossiter [the Company representative] presented a letter prepared by [the Company's] counsel which, in substance, stated the Union would not seek representation of the part-time employees during the contract term and that such letter would be incorporated in the contract. According to Rossiter, he asked McDermott [the Union representative] to sign the letter who then expressed criticism of the counsel's draftsmanship and refused to sign the letter.   McDermott then put the letter in his briefcase.   McDermott testified he did refuse to sign the letter and criticized the legal terminology of the letter.   He credibly testified he told Rossiter he would prepare the waiver letter

on Union stationery and send it to Rossiter when the contract was signed and Rossiter was not adverse to this procedure.

(A7) (footnotes omitted).   The Union never furnished *its* version of the waiver letter to the Company, allegedly because the final contract was never signed.[24]   Hence even to today's date, neither party has reduced to writing or approved a vital component of their collective bargaining agreement, whether that component was to be included within the main body of the contract or attached to that contract as an addendum.

We recognize, as did the parties to the contract, that the waiver of representation of part-time employees was an essential element requiring their agreement.   We find it inconceivable therefore that a full and complete agreement ready for signature had been effected without the resolution of an issue as vital as this one.[25]

23.   The Company's draft of the letter reads in full:

January 21, 1974

Gentlemen:

This letter will set forth our understanding reached during the course of negotiations leading to our agreement dated January 15, 1974, effective from January 21, 1974 through January 20, 1978 with Highway and Motor Freight Drivers, Dockmen and Helpers, Local Union # 701, hereinafter called the "Union", hereby agrees and pledges as follows:

1) The Union recognizes that it does not now and has never represented the part-time employees of the New York-Keansburg-Long Branch Bus Company, Inc. for purposes of collective bargaining and that the aforementioned agreement is inapplicable to such employees in its entirety.

2) During the course of the abovementioned agreement, the Union will refrain from seeking representation of all part-time employees now or hereafter employed by the New York-Keansburg-Long Branch Bus Company, Inc.

A part-time employee should be defined as any driver, regardless of the number of hours or days worked, who does not now have seniority or the right to pick work.

This letter shall be deemed incorporated by reference into and a part of the abovementioned agreement entered into between the parties on January 15, 1974 and effective from January 21, 1974 through January 20, 1978.

Very truly yours,
HIGHWAY AND MOTOR FREIGHT
DRIVERS, DOCKMEN AND HELPERS,
LOCAL NO. 701
. . . . . . . . . . . . . . . . . . . . . . . . . . .

Accepted for New York-Keansburg-Long Branch Bus Company, Inc.
. . . . . . . . . . . . . . . . . . . . . . . . . . .

24.   *See* n.10 *supra*.

25.   The ALJ found that the Union agreed to execute the waiver letter as the *quid pro quo* for its work force addendum (A11).   We have discussed the work force addendum and the problems attendant thereto at an earlier part of this opinion, demonstrating the lack of evidence supporting the ALJ's determination. The record is also unclear as to the parties' respective positions concerning the waiver letter.   It appears that the Company believed that the letter could serve to bar a union election only if its terms were incorporated into or made a part of the collective bargaining agreement.   *See* n.11 *supra*;   Company's Brief at 6 & n.10.   If the signed waiver letter was not to be incorporated into or made a part of the contract because of its execution after the signing of the "complete" agreement, it might arguably be deemed a legal nullity.   We question why, with belief in such a circumstance, the Company would "exchange" a possible legal nullity for a more stringent work force addendum.

Even more curious is the following question: precisely what document did the parties expect the Union to furnish and the Company to ac-

## V

The entire course of the conduct of the parties, as evidenced by their actions, their correspondence, and their drafting and re-drafting of the contract documents, leaves no room for doubt that both parties were extremely conscious of, and placed strong emphasis upon, the precise terms by which their agreement was to be expressed. This being so, we do not think it unreasonable to ask the following question of ourselves, as we did of counsel: just what are the precise terms of the waiver and the work force provisions to which both parties agreed? Which of the various documents is the Company to sign in order to remedy its "refus[al], upon request, to sign the collective-bargaining agreement embodying the terms and conditions of employment on which [the Company] and the Union reached agreement in December, 1974"? (Order of ALJ at A17).

The Board's only answer to these questions has been that the Company is required to sign a contract document prepared in December, 1974 (GC 8) containing an apparently approved work force provision limited to "three men above the number of posted runs" (Article XIII, section 8, at A767), *supplemented by* an unwritten addendum which designates a potentially greater (thirty-five driver) minimum work force *and a* letter waiving representation of part-time bus drivers, which letter has not yet been drafted by the Union nor approved by the Company. Neither the Company nor the Union however can be bound by a collective bargaining provision to which it did not agree. *H. K. Porter Co., Inc. v. NLRB,* 397 U.S. 99, 102, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970).[26] Even if it be contended that the work force provision was approved by the Company (a proposition for which we find no support in the record), it is undisputed that the letter which waived representation of part-time workers never received the approval of both parties. In such a circumstance the Company cannot be forced to execute that which it did not approve and indeed, that which does not exist.

## VI

■ We will deny enforcement of the Board's order dated April 5, 1977 because we "cannot conscientiously find that the evidence supporting [the Board's] decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." *Universal Camera Corp. v. NLRB,* 340 U.S. at 488, 71 S.Ct. at 465; *see Altemose Construction Co. v. NLRB,* 514 F.2d 8, 13–17 (3d Cir. 1975).[27] In fact the evidence in support of the ALJ's decision in our opinion is completely insubstantial, and the credible evidence that does appear in the record compels the conclusion that the parties never agreed to a final collective bargaining contract.[28] We therefore will not enforce the Board's order.

■ Additionally we may not enforce those portions of the order which proscribe the unfair labor practice charges which depend upon the parties' agreement to a final contract, to wit, the Board's order which compels: restitution of payments to the welfare and pension fund to remedy the Company's alleged mid-term modification

---

cept *after* the agreement had been executed? The ALJ's opinion does not resolve this question.

26. There the Supreme Court stated: "while the Board does have power . . . to require employers and employees to negotiate, it is without power to compel a company or a union to agree to any substantive contractual provision of a collective-bargaining agreement." 397 U.S. at 102, 90 S.Ct. at 823.

27. In *Altemose* our Court reversed the Board order under review and remanded the case for reconsideration of the credibility of witnesses

and of certain "objective factors" in light of "discrepancies in the [credited] testimony," the "improbability" of certain testimony, the use of improper inferences, and the peculiar history of the dispute.

28. Because of our disposition of this issue we do not treat with the Company's contention that the Union's unfair labor practice charge against the Company which was filed on June 26, 1975 is time-barred under § 10(b) of the Act, 29 U.S.C. § 160(b).

of the "contract";[29] reinstatement with back pay of the striking workers who were allegedly protesting the mid-term contractual modification;[30] and the posting of notices. (A16–18(a), A20–21).

The Board's petition for enforcement will accordingly be denied.

---

**29.** The Board has not raised nor briefed the contention that absent a contract, the Company's cessation of pension and welfare fund payments constitutes a § 8(a)(5) violation under the doctrine of *NLRB v. Katz*, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1926). We therefore do not pass upon this issue, but emphasize that our disposition of the Board's petition is without prejudice to any other appropriate action which may be pursued.

**30.** If the Company's employees were striking in response to an unfair labor practice committed by the Company, they would be entitled to immediate reinstatement upon an unconditional demand for reinstatement, even if replacements had been hired. *NLRB v. W. C. McQuaide Co.*, 552 F.2d 519, 528–29 (3d Cir. 1977); *NLRB v. Juniata Packing Co.*, 464 F.2d 153, 155 (3d Cir. 1972). If, on the other hand, the strikers were economic strikers only, an unconditional request for reinstatement would entitle them to their former position only if the employer had no "legitimate and substantial business justifications for [refusing]." *NLRB v. Great Dane Trailers*, 388 U.S. 26, 34, 87 S.Ct. 1792, 1798, 18 L.Ed.2d 1027 (1967); *accord, NLRB v. W. C. McQuaide Co.*, 552 F.2d at 528.