**MACK TRUCKS, INC., Plaintiff,**

v.

**INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, UAW, Defendant.**

**Civ. A. No. 87–4379.**

United States District Court, E.D. Pennsylvania.

Oct. 26, 1987.

Montgomery, McCracken, Walker & Rhoads, Carter R. Buller, Carol A. Mager,

John E. Caruso, Maureen M. Rayborn, Philadelphia, Pa., for plaintiff.

Markowitz & Richman, Richard H. Markowitz, Philadelphia, Pa., William T. Josem, Leonard R. Page, of counsel, for defendant International Union, UAW, Detroit, Mich.

## OPINION

CAHN, District Judge.

Plaintiff Mack Trucks, Inc. (hereinafter "Mack") brought the instant action pursuant to 28 U.S.C. § 2201 seeking declaratory relief against the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW (hereinafter "Union"). The matter was heard without a jury. After extensive oral argument I entered a final order. This opinion is filed to explain the rationale for the final order.

I make the following findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52.

## FINDINGS OF FACT

1. Mack is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business in Allentown, Lehigh County, Pennsylvania. Mack manufactures heavy duty trucks and is engaged in an industry affecting interstate commerce.

2. The Union is a labor organization maintaining its principal office at Solidarity House, 8000 East Jefferson Avenue, Detroit, Michigan. Union's members are employees in an industry affecting interstate commerce.

3. Mack and the Union were parties to a master collective bargaining agreement ("the 1984 master agreement"), effective from October 30, 1984, until October 20, 1987. The 1984 master agreement covers Mack employees in bargaining units represented by four local unions: Local 677 in Allentown and Macungie, Pennsylvania; Locals 171 and 1247 in Hagerstown, Maryland; and Local 229 in Somerset, New Jersey.

4. On February 24, 1987, the Union's executive board rejected agreements Mack had negotiated with Locals 677, 171, 1247, and 229. The agreements between Mack and the Local Unions contained provisions for job security for Union employees of Mack.

5. Efforts by Mack and the Union to negotiate a new master collective bargaining agreement to take effect October 20, 1987, continued through April 8, 1987, but failed to materialize as of that date.

6. In early April, 1987, Mack and the Union agreed to mediate their differences with the assistance of W.J. Usery, Jr., a former Secretary of Labor in the Cabinet of the President of the United States.

7. At Mr. Usery's request, representatives of Mack and the Union met in Crystal City, Virginia, from April 18, 1987, to April 23, 1987.

8. On or about April 20, 1987, representatives of Mack presented a modified proposal to the Union.

9. After intensive negotiations, in the early morning hours of April 23, 1987, Mack and the Union reached agreement on the terms of a new master collective bargaining agreement. The agreement between Mack and the Union was oral and culminated with a shaking of hands by the negotiators for each side.

10. On April 24, 1987, Walter Meck, a Mack official and negotiator, on the basis of his participation in the Crystal City negotiations, prepared a letter and summary of the key elements (plaintiff's exhibit 17) of the new master agreement for transmittal by John Curcio, Mack's Chief Executive Officer, to the members of Mack's Board of Directors.

11. The key elements of the new master agreement as set forth in plaintiff's exhibit 17 are as follows:

(a) A five and one-half year term, effective immediately following ratification;

(b) A commitment by Mack that during the term of the new master agreement it will not close any existing facilities at which work is being performed by members of the Union (other than the previously announced closing of the Allentown assembly division);

(c) The assignment to Mack's Macungie facility of its complete knockdown operations and the assembly of all of its cab over engines models, its glider kits, and the "Baby 8" model;

(d) No further outsourcing by Mack during the term of the agreement;

(e) The implementation by Mack of its five year capital investment program of $22,000,000 for the Macungie assembly division and $100,000,000 for the Hagerstown power train division;

(f) The company's consent to fund and implement the special early retirement benefit program as defined in the 1984 master agreement, as to all eligible Mack union employees;

(g) The maximum term of health care benefits currently provided to laid off employees to be extended from 13 months to 24 months for Mack's active union employees laid off as a result of the previously announced closing of the Allentown assembly division and the outsourcing of miscellaneous machining and carriers at the Hagerstown power train division;

(h) A reduction of $.85 to $1.10 per hour to be made to the wage rate schedule;

(i) Productivity improvements of up to twenty percent (20%) to be implemented at Macungie, effective on the date of the start up of the "Baby 8" model or January 4, 1988 (whichever is later), and Hagerstown, effective June 8, 1987;

(j) Job security guarantees for members of Local 677's engineering unit and the placement of the proposed centralized computer center in the Lehigh Valley, if constructed during the term of the new master agreement;

(k) The creation of a Protected Employee Group ("PEG") Program, replacing the current Mack Income Security ("MIS") Program, with a $33,000,000 "bank" of funds to be used to offset the impact of future events such as improved methods of doing business, new technology and market turndowns exceeding ten percent (10%) of PEG

employment levels (such levels to exclude the impact of 5C and other plant closings, Hagerstown outsourcing, productivity improvements, and the higher than normal current employment levels due to the strike bank and current market conditions;

(l) The grievances concerning employee transfer to Winnsboro and the Union's entitlement to automatic recognition at Winnsboro to be subject to an "accelerated" arbitration process on May 5th and 6th, 1987;

(m) Certain supplemental unemployment benefits claims, currently unfunded, to be funded;

(n) Scheduled pension increases to occur during the term of the new contract;

(o) The scheduling of wage improvements of $.15 per hour effective January 1, 1990, 1991, and 1992;

(p) A health care cost containment program to be implemented as quickly as possible;

(q) Group insurance benefits to be improved throughout the term of the |contract;

(r) A program of company funded lump sum payments to be established in return for voluntary terminations of employment.

12. With the exception of the items mentioned in the preceding paragraphs and certain additional items set forth in the discussion of legal issues below, in all other significant respects, the provisions of the 1984 master agreement were carried forward into the new master agreement.

13. As of April 23, 1987, all that remained to be done in order to complete the collective bargaining process was to obtain ratification from the union members acting through their locals and to reduce the new master agreement to a written contract.

14. In order to inform the membership of pertinent contract provisions, the local unions, based upon information provided by the Union, prepared written summary sheets of the new provisions. Copies of the summaries were distributed or posted at the Allentown, Macungie, and Hagerstown locations prior to the May 3, 1987, ratification meetings.

15. The summaries (plaintiff's exhibits 22 and 23) are consistent with the key elements of the new master agreement set forth in Finding of Fact No. 11 and contain the specific wage and benefit terms which were agreed upon.

16. A majority vote of Mack's employees covered by the 1984 master agreement was required to ratify the new master agreement.

17. In Allentown, the new master agreement was ratified by a vote of 1362–303.

18. In Hagerstown, the new master agreement was ratified by a vote of 736–81.

19. In Somerset, the new master agreement was ratified by a vote of 29–12.

20. On May 4, 1987, Governor Casey of Pennsylvania convened a press conference to announce the new master agreement. Mr. Usery, the mediator, and a union representative who attended the press conference also confirmed that a new master agreement had been reached. Although the Hagerstown office workers did not vote on ratification of the new master agreement, there were fewer than 100 office employees at Hagerstown and, therefore, a majority of Mack union employees, voted in favor of ratification.

21. The technique Mr. Usery used to secure the agreement between Mack and the Union involved the concept of a "carve out" of a dispute between the parties relating to Mack's new plant at Winnsboro, South Carolina. This concept involved:

(a) An identification by Mr. Usery that the problems relating to automatic recognition of the Union by Mack at the Winnsboro facility were incapable of being negotiated. Nor could the parties negotiate the rights of union employees to transfer employment to the Winnsboro facility from the Allentown, Macungie, and Hagerstown facilities;

(b) Mr. Usery obtained the consent of the parties to carve out of the mediation process the automatic recognition and transfer rights issues;

(c) The parties agreed that those issues would be resolved by a reference to a labor arbitrator with the understanding that the decision of the arbitrator would be final, binding, and not subject to appeal. It was also contemplated that the arbitrator would render a prompt "bench" decision;

(d) With the Winnsboro issues carved out of their dispute, the parties were able to reach agreement on the other issues before them in regard to the new master agreement;

(e) The arbitration was to be held as soon as practicable and pending grievances were to be used to present the issues to the independent arbitrator.

22. On June 19, 1987, the arbitrator issued his award. He held that Mack was not automatically required to recognize the Union at Winnsboro but that laid off or displaced Mack employees had transfer rights to the Winnsboro facility which superseded the rights of any new employees Mack might hire for work at that plant. In his award, the arbitrator observed:

"...Mack and the UAW entered into a 5½ year master contract to replace the existing one. The new contract is to be effective from May 4, 1987, until November 3, 1992."

23. From April 23, 1987, to June 19, 1987, the parties were involved in the process of memorializing their oral agreement in a written document. As of June 19, 1987, the parties had not completed this task.

(a) Following the receipt of the arbitration award, the Union did not act reasonably, properly, or promptly to complete the task of reducing the oral agreement to writing;

(b) Mr. Collins, a Union negotiator, admitted in his testimony that as a result of the Winnsboro arbitration award and problems with the company regarding the implementation of that award, the Union would not complete the task of drafting the contract language for the agreement reached at Crystal City, Virginia.

24. On July 6, 1987, the Union took the position that no new collective bargaining agreement existed until reduced to writing and that no "meeting of the minds" took place at the mediation held in Crystal City, Virginia.

25. Pursuant to the terms of the new master agreement, Mack:

(a) Participated in the accelerated arbitration of the Winnsboro issues;

(b) Began to implement the provisions referred to in paragraph 11 including making substantial capital expenditures to continue operating the Hagerstown and Macungie facilities during the 5½ year term of the new master agreement.

26. The Union's refusal to complete the process of reducing the new master agreement to writing was designed to exert pressure on Mack in regard to the Winnsboro issues and did not arise from any disagreement as to what had been agreed upon at Crystal City.

## DISCUSSION

As a preliminary matter, this court must determine whether it has subject matter jurisdiction over the controversy. The Union contends that it does not, relying primarily on the language of § 301(a) of the Labor Management Relations Act, 1947, as amended, 29 U.S.C. §§ 141–187 (1982), which states that federal district courts shall have jurisdiction over "[s]uits for *violation* of contracts between an employer and a labor organization", 28 U.S.C. § 185(a) (1982) (emphasis added). Asserting that no "violation" of the new master agreement has been alleged, and that no breach has in fact occurred, the Union argues that this case falls outside of the jurisdictional grant of § 301.[1] According to the Union, the es-

---

**1.** The Union cites *Leskiw v. Local 1470, IBEW,* 464 F.2d 721 (3d Cir.1972), *cert. denied,* 409 U.S. 1041, 93 S.Ct. 526, 34 L.Ed.2d 490 (1972), and *Adams v. Budd Co.,* 349 F.2d 368 (3d Cir.1965), to buttress its contention that § 301 confers jurisdiction on the federal courts over suits for

*violation* of labor contracts. Properly read, however, these cases stand for the proposition that the federal courts have jurisdiction over suits for violation of *labor contracts.* In both *Leskiw* and *Adams,* the rights alleged to have been violated did not arise out of a "contract

sence of Mack's claim is that the Union has failed to reduce an oral collective bargaining agreement to writing. The Union argues that such a refusal, if it occurred, would constitute an unfair labor practice falling within the exclusive jurisdiction of the National Labor Relations Board. *See San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959); 29 U.S.C. § 158(b)(3), (d) (1982) (defining unfair labor practices by a union).

The Union's position is unsound for several reasons. First, Mack has satisfactorily established a breach by the Union of the new master agreement.[2] The Union's letters dated July 6 and July 10, 1987, unequivocally express the Union's position that a new collective bargaining agreement had not been reached. I find that this denial constituted a clear breach by repudiation, or an "anticipatory breach," of the new master agreement. *See Restatement (Second) of Contracts* § 253 (1979); *see also id.* at comment d (noting availability of declaratory relief in order to "avoid harsh results").

Second, the Union's letters of July 6 and July 10, 1987 charge Mack with violating its obligations to the Union under the old agreement by unilaterally implementing the terms of the new collective bargaining agreement. While it is true that the availability of declaratory relief neither augments or diminishes federal jurisdiction, *Skelly Oil Co. v. Phillips Petroleum Co.,*

339 U.S. 667, 671–72, 70 S.Ct. 876, 879, 94 L.Ed. 1194 (1950), one of the principal goals of the Declaratory Judgment Act is to allow a party, when uncertainty has been injected into a legal relationship, to have an adjudication clarifying its rights "without having to wait until his adversary should decide to bring suit, and to act at his peril in the interim." *Shell Oil Co. v. Frusetta,* 290 F.2d 689, 692 (9th Cir.1961); *see also Berlitz School of Languages of America, Inc. v. Donnelly & Suess, Inc.,* 84 F.Supp. 75, 77 (E.D.Pa.1949). If a breach is essential to federal jurisdiction under § 301, a breach by either party is sufficient. *See Todd Shipyards Corp. v. Industrial Union of Marine and Shipbuilding Workers, Local 39,* 344 F.2d 107 (2d Cir.1965). The Declaratory Judgment Act permits the party accused of breaching the agreement to seek a declaration of its rights and obligations under the agreement, without having to wait for the non-breaching party to bring an action to enforce the terms of the collective bargaining agreement.

Finally, a breach is not necessary to the maintenance of a declaratory judgment action under § 301 when the moving party is arguably subject to conflicting obligations under two or more different agreements. Judge Garth's opinion in *Jersey Cent. Power & Light Co. v. Local Union 327, IBEW,* 508 F.2d 687 (3d Cir.1975), *vacated,* 425 U.S. 987, 96 S.Ct. 2196, 48 L.Ed.2d 812, *on*

---

between an employer and a labor organization ... or between any such labor organizations," but arose from a source separate and distinct from any such contract. It was upon this basis that the suits in each of these cases was dismissed for lack of jurisdiction.

It is clear that plaintiffs in both *Leskiw* and *Adams* alleged *violations* of certain rights. None of the rights that they alleged had been violated, however, were based on a labor contract. What is important for § 301(a) purposes is that the rights and duties arising from a collective bargaining agreement be at issue, either because it allegedly has been violated or because its existence is controverted. In neither *Adams* or *Leskiw* were the existence or terms of a collective bargaining agreement at issue. On the contrary, the question each of those cases presented was what effect a collective bargaining agreement, the terms and existence of which were undisputed, would have on rights separate from that agreement.

**2.** Arguably no breach at all is required for § 301 jurisdiction. The Circuits are split on the issue of whether a breach is a condition precedent to the bringing of a suit under § 301. *Compare United Steelworkers v. Rome Industries, Inc.,* 437 F.2d 881 (5th Cir.1970) (allegation of breach not necessary) *and Black–Clawson Co. v. International Ass'n of Machinists Lodge 355,* 313 F.2d 179 (2d Cir.1962) (same) *and McNally Pittsburg, Inc. v. International Ass'n of Bridge, Structural & Ornamental Iron Workers,* 812 F.2d 615 (10th Cir.1987) *with NDK Corp. v. United Food and Commercial Workers,* 709 F.2d 491, 97 Lab.Cas. (CCH) ¶ 10,222 (7th Cir.1983) (no jurisdiction to determine validity of contract absent breach) *and Alvares v. Erickson,* 514 F.2d 156 (9th Cir.), *cert. denied,* 423 U.S. 874, 96 S.Ct. 143, 46 L.Ed.2d 106 (1975) (allegation of breach is element in stating a cause of action under § 301).

*remand,* 542 F.2d 8 (1976) (reaffirming prior decision on jurisdictional issue), is persuasive on this point. The similarity of the facts in *Jersey Central* to the facts in the present case underscores the precedential value of that opinion. In *Jersey Central,* the Company planned to lay off a substantial number of employees. Before it had breached or had been accused of breaching its collective bargaining agreement, the Company sought a declaratory adjudication of the proper method to effecutate the planned cut-backs. Under its collective bargaining agreement, the Company was required to implement lay-offs on a strict seniority basis. Under a conciliation agreement with the EEOC, however, a layoff accomplished by seniority alone would arguably be prohibited. Because it was "[c]onfronted with two apparently conflicting contracts" the court held that the Company had properly invoked the Court's jurisdiction.

The position Mack finds itself in is no different. It is faced on one hand with the right and the obligation to implement the terms of the new collective bargaining agreement, which it has begun to do. On the other hand, it has been told by the Union that a new collective bargaining agreement does not exist, that it must adhere to the terms of the old master agreement, and that the Union is "prepared to take economic action" on October 20, 1987, the date the old master agreement was scheduled to expire. Under these conditions, Mack is entitled to a declaratory judgment even in the absence of a discrete breach.

The entertainment of actions for declaratory relief rests within the sound discretion of the court. *Davis v. Romney,* 490 F.2d 1360, 1369–70 (3d Cir.1974). I have exercised my discretion to proceed in this matter because the public interest is well served by the prompt resolution of the uncertainty that has surrounded Mack, its employees, and the economy of eastern Pennsylvania. In addition, this court takes cognizance of the public policy expressed by Congress in promoting labor peace and stability. *See* 29 U.S.C. § 141(b) (1982) (policy of LMRA is to avoid industrial strife). Moreover, in light of the fact that Mack had partially performed its obligations and in view of the imminence of October 20, I determined that a declaratory judgment would "avoid ... the 'accrual of avoidable damages to one not certain of his rights.'" *ACandS, Inc. v. Aetna Casualty and Surety Co.,* 666 F.2d 819, 823 (3d Cir.1981) (quoting *Dewey & Almy Chemical Co. v. American Anode, Inc.,* 137 F.2d 68, 69 (3d Cir.), *cert. denied,* 320 U.S. 761, 64 S.Ct. 70, 88 L.Ed. 454 (1943)). I reach this decision bearing in mind that the purpose behind the enactment of LMRA was twofold: to promote industrial peace and responsibility, *Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 454–55, 77 S.Ct. 912, 916–17, 1 L.Ed.2d 972 (1957), and to allow for the development of a consistent body of labor law, *Local 174, Teamsters v. Lucas Flour Co.,* 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962); and that in effectuating these purposes § 301 should be liberally interpreted, *Smith v. Evening News Ass'n,* 371 U.S. 195, 199–200, 83 S.Ct. 267, 269–70, 9 L.Ed.2d 246 (1962).

■ On the merits of this case, the Union contends that no contract was formed between the parties because the parties had been unable to resolve several disputes with respect to the contractual language to be used to memorialize the agreement between them. To resolve this issue I turn for guidance to Judge Garth's opinion in *N.L.R.B. v. New York–Keansburg–Long Branch Bus,* 578 F.2d 472 (3d Cir.1978). In that case, the National Labor Relations Board petitioned the Court of Appeals for the Third Circuit to enforce an order against an employer based upon a finding that the employer committed an unfair labor practice by refusing to execute a collective bargaining agreement after it had allegedly reached an oral agreement with the union.

The court refused to enforce the order because Judge Garth found no substantial evidence that an accord had been reached. In so doing, he enunciated several tests to determine whether a union and an employer had reached an actual agreement in regard to an alleged oral collective bargain-

ing agreement. Judge Garth first opined that "[i]n the field of labor relations when the parties have agreed to the substantive terms and conditions of a contract, even though it may not be reduced to writing, they can nevertheless be held to its terms." 578 F.2d at 477.

The next focus of inquiry becomes whether, as a matter of fact, the union and the employer agreed on the material terms and conditions of the alleged collective bargaining agreement. If there is proof that the union and the employer agreed on the substantive terms of a collective bargaining agreement, then such an agreement becomes valid and binding on the parties. In examining whether an agreement has been reached the court must look to federal labor relations law and not state contract law. *Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 211, 105 S.Ct. 1904, 1911, 85 L.Ed.2d 206 (1985) (questions relating to what the parties to a labor agreement agreed to are resolved by federal law). I find that there is no dispute on the vast majority of the provisions of the new master collective bargaining agreement.[3] Moreover, I find a substantial accord between the parties on all material terms of the new master agreement to have been reached at Crystal City.

Despite the manifest agreement between the parties, there were several issues raised at trial that merit discussion. The most important issue relates to Mack's agreement not to outsource to any further extent components used in the manufacturing of its trucks, and to maintain the production of certain truck models at certain facilities.

The parties agree that it had been their intent at Crystal City that there would be no further outsourcing during the term of the new agreement. After Crystal City the parties disagreed on what language should be used to express this intent. I find that they did not disagree as to what precisely "no further outsourcing" meant. The Un-

ion has three concerns. First, the Union does not want the company to be able to circumvent its agreement and begin manufacturing replacement models at other manufacturing facilities merely by changing the model number or name. The Union has vigorously insisted that all replacement models be manufactured in the same facility where the precursor was manufactured. Second, while the company desires an Act of God exclusion to outsourcing in order to protect it from calamities such as fire or earthquakes, the Union wants to make sure that the Act of God concept cannot be utilized to justify outsourcing otherwise prohibited by the new master agreement. Third, Mack has proffered language which provides that the prohibition against outsourcing would not prevent the implementation of improved methods of doing business which might, in turn, reduce employment. The Union is concerned that outsourcing otherwise prohibited by the master agreement might be validated by the claim that outsourcing itself is an improved method of doing business.

In construing a collective bargaining agreement, a court should construe the agreement as a whole. *H.C. Lawton, Jr., Inc. v. Truck Drivers, Chauffeurs and Helpers Local 384,* 755 F.2d 324, 328 (3d Cir.1985). In addition, as it is for all contracts, the intent of the parties is of paramount concern. The basis underlying the entire agreement between the parties is that the employees would make certain wage and benefit concessions in return for better job security. Absolutely essential to the Union's assent were the guarantees it received with respect to outsourcing and the continued production of certain models at their current manufacturing locations. Indeed, based upon the evidence presented at trial, I find that the Union would not have entered into the new collective bargaining agreement without these guarantees which were the *quid pro quo* for certain wage and benefit concessions.

---

**3.** There were some minor disputes between the parties including whether or not Martin Luther King's birthday would be observed on the Friday before Labor Day or on the designated national holiday. At the trial it became clear that the parties' intent is to observe the holiday as scheduled in January.

Mack stated at trial that it no longer disagreed with the Union's understanding. Therefore, by agreement of the parties, I find that the language disputes involving outsourcing and the continued production of various models at certain locations should be resolved in favor of the Union. The method for achieving this resolution will be discussed below.

At trial, although there first appeared to be some dispute, the parties agreed that Sections 3 and 5 of Article 28 in Plaintiff's Exhibit 80 ("P–80") would not be part of the new master agreement. The subject areas covered by these sections have been superseded by the parties' understanding with respect to outsourcing and job security. In addition, the parties agree that the language used in drafting Mack's protected employee group ("PEG") plan should not be construed to undercut in any way the job security and outsourcing provisions contained in other parts of the agreement. Moreover, Mack agrees with the Union with respect to those objections to P–80 raised by John Collins in his letter of October 8, 1987 concerning the first and third pages of letter 8, the "grow-in" provision in letter 29, and the word "mutual" in letter 30.

The Union has submitted guidelines pertaining to the concept of quality of work life and the company has not seriously disagreed with them. The Union guidelines shall be included in the new master collective bargaining agreement.

Another issue that arose at trial concerned the funding of Mack's supplemental unemployment benefit ("SUB") plan. The parties agreed on the language that is to govern the plan, and Mack concedes that it is bound by that language. Because the parties disagree on how that language is to be interpreted, there is a dispute as to whether Mack has been properly funding the plan. This dispute should be resolved through the grievance and arbitration procedures.

The Union, on the last day of argument following the trial, contended that no agreement had ever been reached as to whether a PAYSOP would be established under the new agreement for bargaining unit employees. Mack responded that the parties had agreed that, as a result of the 1986 Tax Reform Act (which removes the provision authorizing PAYSOP's), this provision would be deleted from the new master agreement. The Union's counter-thrust was that the parties had agreed to establish some type of an alternative plan in lieu of a PAYSOP. I find that the Union's position on this point is unreasonable, without a shred of evidence to support it, and was manufactured late in the trial in order to avoid a finding that there had been substantial agreement as to the terms of the new master agreement.

Finally, there is a dispute between the parties regarding whether certain step increases in pension benefits are to apply to persons who retire after January 1, 1987, or only to those who retire after January 1, 1988. This issue seems to have been passed over at Crystal City and therefore no meeting of the minds was reached with respect to it. I find however that this provision is not a "material" "essential" or "operative" term of the agreement. Persons who retire between January 1, 1987 and January 1, 1988 will receive a pension and an additional lump sum even under Mack's understanding. The only outstanding issue concerns certain increases in lieu of the lump sum payment. Although these increases are immaterial to the agreement as a whole, they are not insignificant to the affected retirees and the parties are directed to negotiate this issue in good faith.

The Union has called to my attention no other disputes between it and Mack pertaining to the new master collective bargaining agreement. Consequently, I have no hesitancy in declaring this agreement to be in effect between the parties.

The final step is to ascertain exactly what document should be declared to be the master collective bargaining agreement between the parties. Mack has prepared plaintiff exhibit 80 ("P–80") which purportedly represents all of the agreed terms between the parties. I will declare P–80 as modified by this opinion to be the new master collective bargaining agreement be-

tween the parties, subject to the following exception: all matters pertaining to out-sourcing and job security shall be controlled by the section entitled "Master Contract Modifications," paragraph 1 with subparagraphs (a) through (j) plus a final paragraph, of the memorandum of understanding submitted to the membership of Local 171 prior to the ratification vote by that local on the new master collective bargaining agreement (introduced at trial as plaintiff's exhibit 23).

I reach the following:

## CONCLUSIONS OF LAW

1. This court has subject matter jurisdiction to adjudicate plaintiff's claim for declaratory relief pursuant to Section 301 of the Labor Management Relations Act, 1947, as amended, 29 U.S.C. §§ 141–187 (1982) and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202 (1982).

2. A new master collective bargaining agreement exists between Mack and the Union effective May 4, 1987, until November 3, 1992. The terms of this master collective bargaining agreement are set forth in plaintiff's exhibit 80 as modified by this opinion and by the record in this case.

3. The refusal of the Union to reduce the master collective bargaining agreement to writing was unreasonable and in violation of law.

