[Civ. No. 6510. Fifth Dist. Sept. 16, 1982.]

TEX-CAL LAND MANAGEMENT, INC., Petitioner, v.
AGRICULTURAL LABOR RELATIONS BOARD, Respondent;
UNITED FARM WORKERS OF AMERICA, AFL-CIO, Real Party
in Interest.

---

---

COUNSEL

Werdel & Chapin, Werdel, Chapin & Leverett and Sidney P. Chapin for Petitioner.

Manuel M. Medeiros, Daniel G. Stone and Suzanne Vaupel for Respondent.

Dianna Lyons, Francis E. Fernandez, Daniel A. Garcia, Carmen S. Flores, Marco E. Lopez, Carlos M. Alcala, Federico G. Chavez and Ellen J. Eggers for Real Party in Interest.

---

OPINION

BROWN (G. A.), P. J.—Petitioner, Tex-Cal Land Management, Inc. (hereinafter Tex-Cal), seeks review of an order of the Agricultural Labor Relations Board (hereinafter Board) finding that Tex-Cal committed an unfair labor practice when it refused to sign a collective bargaining agreement to which Tex-Cal and real party in interest, United Farm Workers of America (hereinafter UFW), had assented. Tex-Cal's sole contention is that its refusal to sign the agreement was justified because agreement had not been reached on a contract term permitting Tex-Cal to subcontract certain crops exempt from the pact.

The central issue is whether a party can be deemed guilty of an unfair labor practice per se if that party refuses to execute a formal collective bargaining agreement because of a good faith belief that the formal writing does not reflect the true agreement of the parties. It should be emphasized that we are not concerned with contractual reformation in general or with enforcement of a contract.

FACTS

In June 1977 the UFW was certified as the exclusive bargaining representative of Tex-Cal's agricultural employees. The parties thereafter

negotiated a collective bargaining agreement which was in effect from June 1979 until May 10, 1980.

The parties commenced negotiations for a new contract on March 24, 1980,[1] and met approximately 19 times thereafter through June 11 to negotiate the new bargaining agreement. During the negotiations the terms of the previous contract were extended on a day-to-day basis. Emilio Huerta and five members of the employee bargaining committee represented the UFW at the bargaining sessions. Huerta had complete authority to bind the UFW to any agreements reached. Representing Tex-Cal were Attorney Sidney Chapin and Tex-Cal owner Randy Steele. At the administrative hearing below the parties stipulated that although Chapin was Tex-Cal's principal spokesperson during the negotiations, Steele also participated and had complete authority to speak for Tex-Cal and bind it to agreements reached in Chapin's absence.

At the outset of negotiations the parties agreed to certain ground rules. Among other things, the parties agreed that once agreement on a particular article was reached, the negotiators would initial that article to demonstrate complete agreement and curtail potential misinterpretation of the article's terms. Initialing manifested an intent to be bound by particular provisions of the agreement. Huerta and members of the employee bargaining committee initialed for the union; Steele and/or Chapin initialed terms for Tex-Cal. Steele, who was present at all negotiating sessions, admitted that by initialing provisions in Chapin's absence, he signified Tex-Cal's agreement to initialed terms. The ground rules remained unchanged throughout the sessions.

The provision at issue in the instant case is article 17 of the agreement, which relates to Tex-Cal's subcontracting rights. Tex-Cal concedes it has agreed to all other terms in the contract. Prior to May 9, the parties discussed the subcontracting term on several occasions. The key events surrounding Tex-Cal's alleged agreement to the term, however, took place May 9 and 10. Tape recordings of the bargaining sessions of those dates, and transcripts thereof, have been made a part of the certified record in this case.

Steele represented Tex-Cal at the sessions of May 9 and 10; Chapin was not present on either date. On May 9, Tex-Cal initially proposed retaining the subcontracting term from the previous contract. The for-

---

[1] All subsequent dates are 1980 unless otherwise specified.

·mer term had granted Tex-Cal the right to subcontract with respect to various crops and specialized forms of labor; crops and labor subject to subcontracting were exempt from the terms of the collective bargaining agreement. As a result, crops subject to subcontracting, which included wine grapes, canning grapes, raisins, kiwis, and almonds, are referred to as "exempt" crops. Crops subject to union labor ("unit work"), primarily table grapes, were not to be subcontracted. UFW negotiator Huerta initiated a discussion about Tex-Cal's right to expand the acreage devoted to exempt crops at the expense of unit work. He repeatedly indicated his chief concern was to ensure that acreage devoted to unit work not be cut back from levels of previous years; his goal was "to provide as much work as possible" to union workers. Steele assured Huerta that historically it was economically impractical for Tex-Cal to expand exempt crop production at the expense of table grape output. Nonetheless, Huerta told Steele he would attempt to incorporate the ideas raised into language which could be added to the subcontracting article.

On May 10, Huerta presented Steele with a written proposal to amend the language of the subcontracting provision. Huerta read aloud the following proposed term (new language is underscored): "The Company shall have the right to subcontract under the following conditions: [¶] When the Company employees do not have the skills to perform the work to be subcontracted and when the operation to be subcontracted requires specialized equipment not owned by the Company. The Company shall also have the right to subcontract those operations which it has historically subcontracted in the past, provided, however, that the operation to be subcontracted shall be limited to the amount of acreage and man hours of which has been subcontracted in the past. The Company agrees that it shall not subcontract any operation which bargaining unit employees have performed in the past and it shall not subcontract to the detriment of the bargaining unit or the Union." Immediately thereafter, the following exchange took place:

"[HUERTA]: That kind of puts a limit, but it puts an insurance . . . .

"[STEELE]: Yeah, I see what you're getting at.

"[HUERTA]: . . . to not expand any further than has already been expanded. Then the company agrees not to sub-contract any operation which bargaining unit employees have performed in the past. There again, insuring that bargaining work will not be sub-contracted. To not

sub-contract to the detriment of the bargaining unit or the Union ...
that's language similar to what you had ... to not sub-contract to/
against the provisions of this agreement, and then it lists all these oper-
ations. So I took the ideas from what you proposed yesterday about in-
suring the bargaining unit work and just applied it here. And it's about
the same concepts and the language and the operations are the same."
Discussion then proceeded to other terms in the contract.

Later in the session, Steele raised questions regarding the proviso
which limited subcontracting acreage and man-hours to those subcon-
tracted in the past. Steele was concerned that he could not guarantee
keeping man-hours devoted to exempt crops within past limits. It might,
for example, take 10 1/2 hours to do work that took 10 hours last year.
Huerta responded that the language was intended only as a guideline.

Regarding the acreage limitation, Steele asked whether the union's
purpose was to preserve existing unit work—i.e., acreage devoted to
table grapes. Huerta replied that if, for example, Tex-Cal harvested
3,000 acres of table grapes in the past, it would continue to harvest no
more nor less than 3,000 acres of table grapes. Again, the term was
meant as a guideline, so that if unusually severe rain rendered some
grapes unusable as table grapes, Tex-Cal could harvest the grapes for
wine. Huerta noted the amount of table grapes that had gone to wine
before never had a "great impact" on the amount of unit work avail-
able.

Steele then posed a hypothetical: If Tex-Cal was for some reason re-
quired to remove vines from an old vineyard of wine grapes, which are
exempt from the union contract, it would be "culturally impractical" to
replant the acreage with table grapes. Would Tex-Cal nonetheless be
forced to plant table grapes on the land or could it, for example, plant
almonds, which likewise are not subject to the union contract? Huerta
responded that Tex-Cal could plant whatever it wanted on the land for-
merly devoted to wine grapes. Huerta then asked Steele if the acreage
limitation was acceptable. Steele replied: "So far as I'm concerned it
is.... So far as I'm concerned, in concept, this thing is agreeable to
me." He asked, however, if he could have attorney/negotiator Chapin
review the provision before it was initialed. Steele felt that Chapin
should review and initial terms involving legal questions about which
Steele had no expertise. Huerta agreed that Chapin should review the
provision.

On May 14, at the next bargaining session, Steele initialed the sub-contract article without question. By so doing, Steele realized he was binding Tex-Cal to the term. Between May 14 and June 11, Tex-Cal raised no questions or issues regarding the subcontracting term.

On June 11, the parties met to resolve conflicts over certain terms in the contract. Both Steele and Chapin were present at the meeting. The unresolved terms related to wages, retroactivity, and the use of trailers, boxes, and the like. The subcontracting term was not discussed.

After pending terms were resolved, the parties acknowledged that an agreement had been reached on the entire contract. Notes taken by both Steele and Chapin at the June 11 session reflect that Tex-Cal agreed to the contract. The parties shook hands and congratulated each other. The record reflects neither discord nor equivocation on any contract term. The UFW agreed to type the formalized contract and send it to Tex-Cal for approval; the parties then were to set a date for signing the agreement.

The contract was typed by the UFW from all initialed and agreed-upon articles and was mailed to Tex-Cal on July 9. A cover letter from Huerta to Chapin contained the following request: "Once you have reviewed the new contract, please notify me as to any changes or corrections that may be needed or wether [sic] such contract meets the Company's approval as is."

On July 31, Chapin called the UFW office and left a message for Huerta that the contract could be signed at Tex-Cal's office the following morning, August 1. Chapin raised no objection to the contract terms in his message.

The parties met at the Tex-Cal office at 10 a.m. on August 1 to sign the contract. Chapin asked Huerta if he had brought a copy of the initialed contract articles. Huerta answered he had not. Chapin then indicated there were questions regarding the subcontracting article, and asked if Huerta could retrieve the union's copy of the initialed articles from the union office. Huerta complied.

Huerta could not locate the initialed articles at the union office, but returned with his notes from the bargaining sessions. He asked Chapin

what the problem was, then accompanied Chapin, Steele, and another UFW representative into the company conference room. Chapin asked Huerta for the UFW's interpretation of the subcontracting article. Steele offered Huerta a hypothetical: If Tex-Cal had subcontracted 200 acres of raisins last year and were now planning to subcontract 1,000 acres of raisins, would the additional 800 acres be covered by the union contract? Huerta responded that they would be so covered and that Tex-Cal could not subcontract the additional acreage. According to Huerta, Steele then said, "[I]f that's what the language means, then I'm not going to sign any . . . contract," and stormed out of the room. Steele never returned.

Steele's version of the discussion differed slightly: "I asked for an example from Emilio, and the example was: if I laid 200 acres of raisins in 1979, and it was a subcontracted job, and I laid 300 acres in 1980, how much of that 300 acres is going to be covered by the bargaining unit. And he said 100 acres. And I said, so therefore, Emilio, you're telling me that whatever I did last year, I have to do the same amount of acreage in the same amount of man-hours; that whatever I do in 1980, I have to do it by the same amount of men, same—same amount of acreage and same amount of man-hours as I did in 1979. He said that's correct. I said, well, then, we don't have an agreement."

Huerta and Chapin remained in the room. Huerta said that it was "not right for Mr. Steele to do this"; Chapin said he would talk to Steele and contact Huerta later. Huerta promised to send Chapin a copy of the initialed subcontracting article. A copy was hand-delivered to Tex-Cal later that morning.

On Monday, August 4, Chapin asked Huerta for the union's interpretation of the subcontracting provision. Huerta responded that the intent of the provision was to limit the amount of acreage that Tex-Cal could subcontract. Huerta asked whether Tex-Cal was proposing any type of resolution to the dispute to facilitate signing. Chapin said he did not know, and that he was going to speak to Steele the next day. Chapin never offered Tex-Cal's interpretation of the subcontracting term.

Chapin phoned the next day, August 5; Huerta returned the call. Chapin informed Huerta that Steele had instructed him to terminate

the previous agreement which until that point had been periodically extended pending negotiation of a new contract. Chapin further indicated Tex-Cal had no proposal to offer and that Steele was "not willing to sign anything."

In a letter to Huerta dated August 5, Chapin reiterated Tex-Cal's position, informing Huerta "... the Company does not wish to sign the pending collective bargaining agreement because of the lack of agreement between the parties as to the intent of the language contained in Article 17, Subcontracting." The UFW thereupon filed the instant unfair labor practice charge, asserting Tex-Cal was "acting in bad faith by refusing to sign a collective bargaining Agreement which has been fully negotiated between the parties."

After reviewing transcripts of the hearing testimony and the May 9 and 10 bargaining sessions, the administrative law officer (ALO) made the following factual findings as to the scope of the parties' agreement on the subcontracting term:

"a) The company could not subcontract any types of work done in the past by the bargaining unit employees.

"b) *The company could increase the work it subcontracts by leasing additional land, or replanting land, with crops that involve work which can be subcontracted.*

"Nothing said by the UFW altered those facts. Respondent's expressed concerns and interests were covered by the language in [the subcontracting article]. In agreeing to the language, the company did not, thereby, make any mistake." (Italics added.) The ALO further found that after June 11, Tex-Cal "[a]pparently ... became concerned ... that there could be a circumstance that might be covered by [the subcontracting article] that it had not contemplated or considered during the course of the negotiations." This concern, however, was deemed an appropriate matter for arbitration and could not form the basis of a refusal to sign the written contract on August 1. Accordingly, the ALO concluded Tex-Cal committed an unfair labor practice by refusing to sign the contract.

With a minor exception not here pertinent, the Board fully adopted the ALO's findings and conclusions. (*Tex-Cal Land Management, Inc.* (1981) 7 A.L.R.B. No. 11.) This petition ensued.

## DISCUSSION

The Board found Tex-Cal had agreed to the subcontracting term prior to August 1, 1980—the date set for signing the collective bargaining agreement—and that its assent was not a product of mistake. Tex-Cal's refusal to sign the agreement on August 1 thus was deemed an unlawful refusal to bargain in good faith. Petitioner challenges the Board's decision, urging primarily that mutual assent to the subcontracting term was defeated by a "mistake of fact engendered by the Union."

■ With respect to factual matters, the standard of review is clear: factual findings of the Board are conclusive "if supported by substantial evidence on the record considered as a whole . . . ." (Lab. Code, § 1160.8; *Tex-Cal Land Management, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 24 Cal.3d 335, 343-346 [156 Cal.Rptr. 1, 595 P.2d 579].) Despite the deference accorded the Board's factual determinations, the Supreme Court recently expressed a caveat: "While the administrative agency under this test is empowered to resolve conflicts in the evidence and to make its own credibility determination, 'the test of substantiality must be measured on the basis of the entire record, rather than by simply isolating evidence which supports the board and ignoring other relevant facts of record which rebut or explain that evidence.'" (*Martori Brothers Distributors* v. *Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 721, 727 [175 Cal.Rptr. 626, 631 P.2d 60].) Moreover, the Board must accept as true uncontradicted and unimpeached evidence unless there is some rational basis for disbelieving it. (*Id.*, at p. 728.)

■ A collective bargaining agreement need not be reduced to a formal writing to be enforceable. (*Certified Corp.* v. *Hawaii Teamsters & Allied Wkrs.* (9th Cir. 1979) 597 F.2d 1269, 1272; *N. L. R. B.* v. *Ralph Printing & Lithographing Company* (8th Cir. 1970) 433 F.2d 1058, 1061.) However, because memorialization of the pact serves an important stabilizing function in labor-management relations (see *H. J. Heinz Co.* v. *Labor Board* (1941) 311 U.S. 514, 523-526 [85 L.Ed. 309, 316-318, 61 S.Ct. 320]), the duty to bargain collectively in good faith includes the duty to sign, upon request, a written contract embodying the agreement. (Lab. Code, §§ 1153, subd. (e), 1155.2,

subd. (a).)[2] ■ ■■■ ■ Applicable federal precedent[3] has established that the failure to sign such an agreement constitutes a per se unfair labor practice. (*NLRB* v. *Strong* (1969) 393 U.S. 357, 359 [21 L.Ed.2d 546, 548, 89 S.Ct. 541]; *H. J. Heinz Co.* v. *Labor Board, supra*, 311 U.S. at pp. 525-526 [85 L.Ed. at p. 318]; Morris, The Developing Labor Law (1971) pp. 324-325.)

The above-stated rule is subject to the "overriding precondition" that the parties have reached full agreement on contract terms; the question whether agreement was reached is essentially one of fact. (*N. L. R. B.* v. *N. Y.-Keansburg-Long Branch Bus* (3d Cir. 1978) 578 F.2d 472, 477; *N. L. R. B.* v. *H. Koch & Sons* (9th Cir. 1978) 578 F.2d 1287, 1290.) In determining the issue, the NLRB has allowed a responding party the following defense:

"It is . . . settled law that where there is 'no meeting of the minds' as to essential terms of an agreement which may be traced to 'ambiguity for which neither party is to blame,' there is in effect no 'contract' which the parties can be directed to execute. *Capital Packing Co.* [1974] 212 N.L.R.B. at 107-108, quoting from Restatement, Contracts, Sec. 501 (1932). In sum, as the Restatement notes:

"'When, however, misunderstandings may be traced to ambiguity for which neither party is to blame, or for which both parties are equally to blame, and the parties differ in their understanding, their seeming agreement will create no contract.'" (*Liberty Pavilion Nursing Home* (1982) 259 N.L.R.B. No. 177; see also *B. F. Goodrich Chemical Co.*

---

[2]Labor Code section 1153, subdivision (e), decrees the refusal to bargain in good faith to be an unfair labor practice. Labor Code section 1155.2, subdivision (a), defines good-faith bargaining as follows: "For purposes of this part, to bargain collectively in good faith is the performance of the mutual obligation of the agricultural employer and the representative of the agricultural employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any questions arising thereunder, *and the execution of a written contract incorporating any agreement reached if requested by either party*, but such obligation does not compel either party to agree to a proposal or require the making of a concession." (Italics added.)

[3]Labor Code section 1148 provides: "The board shall follow applicable precedents of the National Labor Relations Act, as amended." Because Labor Code section 1155.2, subdivision (a), is substantially identical to the relevant portion of section 8(d) of the National Labor Relations Act (29 U.S.C. § 158(d)), federal precedent is "applicable" within the meaning of Labor Code section 1148. (See, e.g., *Highland Ranch* v. *Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 848, 855-856 [176 Cal.Rptr. 753, 633 P.2d 949]; *Kaplan's Fruit & Produce Co.* v. *Superior Court* (1979) 26 Cal.3d 60, 67-68 [162 Cal.Rptr. 745, 603 P.2d 1341].)

(1977) 232 N.L.R.B. 399, 400-401; *Butchers' Local 120, etc.* (1965) 154 N.L.R.B. 16, 26-27.) The federal board's approach is consistent with general principles of contract law (see Civ. Code, § 1580),[4] adapted to the contours of the labor setting. Moreover, the standard fairly and adequately protects the rights of both labor and management and ensures careful application of potentially overinclusive per se rules.[5]

In the present case, the disputed language provides that Tex-Cal would have the right to subcontract operations which had been subcontracted in the past, *"provided, however, that the operation to be subcontracted shall be limited to the amount of acreage and manhours of which has been subcontracted in the past."* (Italics added.) On its face the language explicitly and unambiguously limits the amount of exempt subcontracted acreage to past levels. The next sentence of the article contains Tex-Cal's agreement not to subcontract work performed in the past by the bargaining unit and not to subcontract to the detriment of the unit. Despite the broad language of the acreage limitation, the Board expressly found, after reviewing transcripts of the bargaining sessions, that the parties had agreed Tex-Cal could expand subcontracted acreage by, for example, leasing additional land. The written proviso in the subcontracting article therefore was broader than that intended by the parties and hence was ambiguous, as the Board and the UFW appear to concede by characterizing the language as "inartful." Nonethe-

---

[4]Civil Code section 1580 provides in pertinent part: "Consent is not mutual, unless the parties all agree upon the same thing in the same sense."

[5]In a perceptive analysis of the function of per se rules in the labor context, Professor Gorman states: "The per se violation is often said to be such either because the respondent's conduct warrants an automatic finding of illegality without the possibility of excuse, or because the finding is based on 'objective' criteria without regard to respondent's 'subjective' state of mind, or because the finding may be made in evidentiary isolation without consideration of the record as a whole. These are all variations of the same underlying theme, a theme which is in most cases quite useful but which may not be altogether accurate. For even particular acts which are commonly treated as per se violations can, admittedly in rare circumstances, be justified by the respondent, typically by showing good faith and significant business reasons....

"It is perhaps more accurate to say that certain conduct at (or away from) the bargaining table is in the preponderance of cases likely to disrupt or frustrate negotiations and not likely to be justified by substantial business reasons. Because of this, the Board and courts will properly presume that such conduct is unlawful, and a strong onus will fall upon the respondent to demonstrate that its conduct was in good faith and warranted in the particular circumstances of the case. Thus, to say that conduct is illegal per se is simply to say that the General Counsel makes out a prima facie case of illegality when it shows that the respondent engaged in such conduct, that a finding of a violation of the Act may be based on that conduct alone, and that the burden of persuading the Board to the contrary rests upon the respondent. The Supreme Court has said as much in [*Labor Board* v. *Katz* (1962) 369 U.S. 736, 747-748 (8 L.Ed.2d 230, 238-239, 82 S.Ct. 1107)] ...." (Gorman, Basic Text on Labor Law (1976) pp. 400-401.)

less, upon Huerta's assurance the union's aim was to protect existing acreage devoted to unit work, Steele assented to the language by initialing it on May 14. Mutual assent to the entire contract was achieved on June 11.

The dispute giving rise to the instant unfair labor practice proceeding, of course, arose when the parties met to sign the formal writing on August 1. Steele's hypothetical regarding future expansion of exempt raisin acreage was cast in general terms and received an unequivocal response from Huerta: any expanded acreage would have to be worked by the bargaining unit and hence could not be subcontracted. Respondent Board and real party UFW point out that Steele failed to indicate whether the expanded operation would be conducted on newly acquired land or land previously devoted to unit work, but the general nature of the question and Huerta's flat response thereto constituted objective and substantial evidence that the parties' understandings materially diverged as to the true scope of the broadly worded acreage limitation. Although Huerta's testimony at the administrative hearing reveals he might have interpreted Steele's question to mean the additional acreage would be taken from the bargaining unit, he never revealed this interpretation to Steele and further testified he told Attorney Chapin, in a conversation of August 4, that "the intent of the article was to limit the amount of acreage that could be subcontracted by the company." This expansive statement, in conjunction with Huerta's response to Steele's questions on August 1, could reasonably have caused Steele in good faith to conclude that Huerta's interpretation of the term was considerably broader than anything intended by Steele during and after the May negotiations.

■ A true "meeting of the minds" thus was not reached as to a material aspect of the contract. Accordingly, Steele's mere refusal to sign the contract did not, without further inquiry and findings as to Steele's good or bad faith, constitute an unfair labor practice under the narrow per se theory pursued by the Board's general counsel. As heretofore noted, a lack of good faith permeates the concept of an unfair labor practice under Labor Code sections 1153, subdivision (e), and 1155.2, subdivision (a) (see fn. 2, *ante*, p. 916).

Having so concluded, we deem it appropriate to point out a fundamental misconception in the Board's approach to this case. The Board downplayed evidence relating to Steele's August 1 questions, adopting the ALO's statement that Steele's concern about Tex-Cal's authority to

expand subcontracted operations was "a circumstance ... not contemplated or considered during the course of negotiations," and concluded Steele's hypothetical problem was an appropriate matter for arbitration under the contract's arbitration clause. Apparently, the Board felt Steele's duty on August 1 was to sign the contract and submit his concerns about the true scope of the agreement to subsequent arbitration. We feel the Board's rationale, as applied to this case, is unsound.

Arbitration is, of course, a laudable and expeditious means by which to resolve disputes that were unforeseeable at the time the collective bargaining agreement was reached. (See *Steelworkers* v. *Warrior & Gulf Co.* (1960) 363 U.S. 574, 580-581 [4 L.Ed.2d 1409, 1416, 80 S.Ct. 1347].) The general propriety of arbitration, however, begs the question whether agreement was reached in the first place: labor boards are statutorily precluded from forcing agreement on any contract term, regardless of the rationale invoked to support such action. (Lab. Code, § 1155.2, subd. (a); *Porter Co.* v. *NLRB* (1970) 397 U.S. 99, 107-108 [25 L.Ed.2d 146, 152, 90 S.Ct. 821].) Moreover, requiring a party to sign a contract despite well-founded, good faith misgivings as to the true scope of agreement on a material written term would place the party in an unenviable position in future arbitration; the arbitrator could, for example, deem the writing unambiguous or could find that the party waived its right to assert lack of agreement by signing the formal writing despite objections to certain contract language. A party is not required by statute to assume that risk by signing a formal contract which he in good faith does not believe represents the true agreement of the parties.

Our conclusion that the Board's per se unfair labor practice finding is unsupportable does not, however, resolve other disturbing issues raised on this record. Because the case was pursued on a per se theory of petitioner's bad faith, the Board did not inquire into or make findings regarding possible bad faith above and beyond the mere refusal to sign the contract. It has been suggested to us that Steele's questions to Huerta on August 1 were posed in a bad faith attempt to delay and to discredit the union in the presence of employees who had gathered to witness the signing. We have indicated a party's position in refusing to sign a labor contract based upon an asserted misunderstanding must not only be reasonable and supported by sufficient evidence, but must also be taken in good faith and not for dilatory or other unlawful purposes. The record before us, however, contains insufficient evidence of Steele's motive in posing his hypothetical question, and the Board made no find-

ing in that regard. The Board therefore should be given the opportunity to pursue further factual inquiry into Steele's purpose in raising his concerns on August 1.[6]

In addition, we find disturbing the recalcitrant stance taken by Steele following his refusal to sign the contract. Despite union requests to renegotiate and resolve the disputed portion of the contract, Steele simply closed the door on further negotiations. It seems undeniable a party's legitimate refusal to sign a collective bargaining agreement does not expunge its statutory duty to bargain collectively in a good faith attempt to reach accord on disputed terms. Consequently, the Board should be allowed upon remand to determine whether Steele's unyielding posture constituted bad faith bargaining. In so doing, of course, the Board is free to take new evidence on the issue.

Let a decree issue setting aside the Board's order and remanding the cause for further proceedings consistent with this opinion.

Zenovich, J., and Hanson (P. D.), J., concurred.

A petition for a rehearing was denied October 14, 1982, and the opinion was modified to read as printed above.

---

[6]We reject the view, posited by the UFW at oral argument, that Steele's questions *necessarily* indicate bad faith on these facts. We believe that before signing a collective bargaining contract, a party may in an appropriate case seek assurances from the other side that a contract term means what the parties negotiated it to mean, particularly where, as here, all parties agree the disputed written term does not accurately reflect the precise scope of the parties' underlying agreement. The propriety of such conduct *turns upon* the good or bad faith of the party seeking assurances, a question for the Board upon remand.