MACK TRUCKS, INC.

v.

INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, UAW.

Appeal of INTERNATIONAL UNION, UAW.

No. 87–1650.

United States Court of Appeals, Third Circuit.

Argued April 12, 1988.

Decided Sept. 12, 1988.

Rehearing and Rehearing In Banc Denied Oct. 11, 1988.

William T. Josem, Richard H. Markowitz, Markowitz & Richman, Philadelphia, Pa., Leonard R. Page (argued), Associate Gen. Counsel, Intern. Union, UAW, Detroit, Mich., for appellant.

Carol A. Mager, Carter R. Buller (argued), Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., for appellee.

Before HUTCHINSON, SCIRICA and GARTH, Circuit Judges.

## OPINION OF THE COURT

SCIRICA, Circuit Judge.

This appeal requires us to consider the jurisdiction of a federal district court to determine the existence of a collective bargaining agreement. In so doing, we must also examine the relationship between the subject matter jurisdiction of the National Labor Relations Board ("the NLRB") and a district court.

Defendant International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW ("UAW") appeals from a district court judgment declaring valid and enforceable a collective bargaining agreement between plaintiff Mack Trucks, Inc., ("Mack") and the UAW. We must address three issues: (1) whether the district court had subject matter jurisdiction under Section 301(a) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a) (1982); (2) whether a contractual grievance and arbitration procedure under a previous agreement barred judicial relief; and (3) whether the district court correctly found a meeting of the minds over the terms of the new agreement. For reasons that follow, we hold that the district court had jurisdiction to consider this action, together with the underlying issue of the existence of a collective bargaining agreement. We also hold that the grievance and arbitration procedure did not bar this suit. Finally, we will affirm the court's finding that the parties created a new collective bargaining agreement.

## I.

Mack and the UAW were parties to a master collective bargaining agreement, effective from October 30, 1984, to October 20, 1987. This agreement ("the 1984 agreement") governed Mack employees in bargaining units represented by four local unions: Local 677 in Allentown and Macungie, Pennsylvania; Locals 171 and 1247 in Hagerstown, Maryland; and Local 229 in Somerset, New Jersey.

In late 1986, Mack and the local unions covered by the 1984 contract commenced preliminary negotiations on a new agreement. Mack desired wage reductions and guaranteed productivity increases. For its part, the UAW sought greater job security. Based on these general proposals, the parties began bargaining in early 1987 on a new collective bargaining agreement.

One of the most significant issues in the negotiations concerned the proposed closing of Mack's assembly plant 5–C in Allentown. In October, 1985, Mack had informed the UAW of its intention to construct a new assembly facility, the location then undetermined. The company assured the UAW that no existing plant covered by the 1984 agreement would be closed during the life of that contract. In January, 1986, Mack announced that the new facility, which was to replace the Allentown assembly plant, would be built in Winnsboro, South Carolina. The Allentown facility was scheduled to close at the end of October, 1987, after the expiration of the 1984 agreement.

On February 25, 1986, the UAW filed a grievance at Allentown Plant 5–C, contending that the plant closing violated the 1984 agreement. On October 1, 1986, the UAW submitted a second grievance at Plant 5–C, claiming that the UAW had a right to automatic recognition at the Winnsboro plant, that Mack was required to apply the 1984 agreement to Winnsboro, and that the agreement controlled the transfer rights of union employees to the new facility. After both grievances were denied at all steps, the UAW sought arbitration. At the time of the negotiations for a new labor agreement, arbitration of the Allentown/Winns-

boro grievances had not yet been scheduled.

In early April, 1987, the parties agreed to hire former United States Secretary of Labor William Usery to mediate their dispute. At Usery's request, representatives of Mack and the UAW met in Crystal City, Virginia, on April 18, 1987. On the night of April 22, after reaching an impasse on the Allentown/Winnsboro disputes, the parties agreed to "carve out" those issues from the new agreement, to proceed to expedited arbitration of the Allentown/Winnsboro grievances on May 5 and 6, 1987, and to accept the arbitration decision as final and binding. Thereafter, Mack and the UAW continued negotiations on the remaining issues. At approximately 7:00 a.m. on April 23, representatives of both parties concluded the negotiations with what they termed a "handshake" session; that is, they shook hands with each other, with Usery, and his assistant, William Hobgood, and congratulated one another on reaching a new agreement. They also discussed the need to hold a ratification vote of UAW members before May 5, so that the agreement would be in effect by the date of the Allentown/Winnsboro arbitration. That morning, Usery announced to the press that Mack and the UAW had reached a "tentative agreement." Transcript of Hearing at 54–55. Usery included the word "tentative" at the request of William Casstevens, vice-president of the UAW International, because the agreement still required approval by the UAW's Mack Truck Council, which represented local union members governed by the agreement,[1] and ratification by union members.

In order to inform the membership of the new agreement, local union officials prepared and distributed summaries of its relevant terms. On May 3, a majority of the UAW members covered by the 1984 agreement ratified the new agreement. In Allentown, it was ratified by a vote of 1362–303; in Hagerstown, 736–81; and in Somerset, 29–12. Although the employees at the

Macungie facility did not vote on ratification of the new agreement, fewer than 100 union members were employed at that plant; therefore, a majority of Mack union employees voted in favor of ratification.

The following day, Pennsylvania Governor Robert P. Casey convened a press conference at Mack's headquarters in Allentown to announce the new agreement. At the press conference, Usery and Kim Blake, president of UAW Local 677, confirmed that the parties had reached a new agreement. On May 5 and 6, Mack and the UAW submitted the Allentown/Winnsboro grievances to arbitration before Arthur Stark, of the American Arbitration Association.

In the weeks following the ratification vote, the parties exchanged proposed contract language intended to reflect the terms of the agreement reached at Crystal City. They also met several times in order to prepare the agreement's specific language. During this period, Mack began to implement certain provisions of the new agreement, including wage reductions and the special early retirement benefits program. From their meetings with Mack in mid-June, the UAW officials learned of this implementation.

On June 19, Stark issued his award on the Allentown/Winnsboro grievances. He determined that the proposed closing of the Allentown facility did not violate the 1984 agreement and that the UAW was not entitled to automatic recognition at the new plant in Winnsboro. He also decided that under the 1984 agreement, certain employees affected by the closing of the Allentown facility had transfer rights to Winnsboro that superseded the rights of prospective employees hired to work at the new plant. At this point the parties had not completed memorializing the new agreement in a written document.

On July 2, the UAW filed a grievance alleging that Mack had unilaterally implemented modifications to the new agree-

---

**1.** At noon on April 23, 1987, Casstevens met with the Mack Truck Council, which voted

unanimously in favor of Casstevens' recommendation to accept the agreement.

ment.[2] Four days later, the UAW wrote to Mack warning that, barring resolution of outstanding disputes and the execution of a document by July 15, the UAW would declare that there was no new agreement between the parties. At the same time, the UAW refused to complete the process of memorializing the agreement in writing. On July 10, the UAW stated in a letter to the company:

> [T]here is not now, nor has there ever been, any agreement with the UAW–Mack Trucks Department to allow you to deviate from the terms and conditions of the October 1984 to October 20, 1987 [Agreements].

App. at 753.

On July 14, 1987, Mack filed suit in district court for a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 (1982), and § 301(a) of the LMRA. The company asked the court to declare valid and enforceable a new collective bargaining agreement between the parties.[3] At the bench trial, Mack introduced into evidence its exhibit 80, prepared at the request of the district judge, as a summary of the parties' agreement reached on April 23 and of the unresolved disputes over contract language. In open court, the district judge questioned counsel for the parties in order to determine what disagreements remained and to resolve disputes over language. At the trial's conclusion on October 9, 1987, the judge issued an order declaring that a new collective bargaining agreement existed and that Mack's Exhibit 80, as modified during the courtroom discussion, represented the new agreement. On October 26, 1987, the court issued an opinion containing findings of fact and conclusions of law. *See* 671 F.Supp. 1027. This appeal by the UAW followed.

## II.

As a threshold matter, we must determine whether the district court had subject matter jurisdiction to consider the issues raised in this case. In its opinion, the court concluded that it had jurisdiction pursuant to the Declaratory Judgment Act[4] and § 301(a) of the LMRA. Section 301 provides, in relevant part:

> Suits for violations of contracts between an employer and a labor organization representing employees in an industry affecting commerce ... may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a).

The UAW raises two closely related arguments contesting the district court's judgment. First, the UAW contends that Mack's claim involves issues uniquely within the expertise of the NLRB, rather than a

---

**2.** The grievance stated:

> The union protests the Company unilaterally implementing changes in the Master and Local current Agreement. On June 8, 1987, the company implemented changes in the current Agreement which only benefited them. The Company implemented changes on June 8, 1987, which did not reflect the understandings which we had reached with the Company.

App. at 2007.

**3.** Specifically, Mack alleged:

> Mack needs a prompt declaration of the validity and enforceability of the April 23, 1987 Agreement in order to obtain the vital intangible benefit of the labor stability provided for by the April 23, 1987 Agreement and to avoid the substantial economic injury to Mack arising from the International Union's attempt to unilaterally repudiate the agreement.
> WHEREFORE, Mack respectfully prays that this Honorable Court enter an Order declaring that the April 23, 1987 Agreement with the International Union constitutes a valid and enforceable collective bargaining agreement, enjoining the International Union from taking any economic or other action inconsistent with the April 23, 1987 Agreement, and granting to Mack such other and further relief as may be deemed appropriate to enforce its rights, including an award of reasonable attorneys' fees and costs.

Complaint at 8–9.

**4.** The Declaratory Judgment Act has only a procedural effect. Although it enlarges the range of remedies available in federal courts, it does not create subject matter jurisdiction. Thus, a court must find an independent basis for jurisdiction before it can consider a declaratory judgment action. *See Federal Kemper Ins. Co. v. Rauscher*, 807 F.2d 345, 351–52 (3d Cir.1986).

contract action within the district court's jurisdiction. Therefore, it maintains, the NLRB's exclusive authority over bargaining conduct preempts the district court from acting. *See San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 244, 245, 79 S.Ct. 773, 779, 780, 3 L.Ed.2d 775 (1959). Second, it argues § 301(a) cannot confer jurisdiction on the district court because it authorizes courts to adjudicate only disputes over alleged violations of a collective bargaining agreement, not controversies over the actual existence of a contract.

In response, Mack contends that its claim is a straightforward contract action, which is broader than the type of matter generally preempted in favor of the NLRB. Alternatively, it maintains that because the UAW violated the new agreement by repudiation,[5] the district court properly held that it had jurisdiction over the claim. Alleging a contractual breach, Mack argues, is not a condition precedent to the court's jurisdiction under § 301(a) to decide whether a contract existed. Finally, Mack contends that even if its contract violation claim might also constitute an unfair labor practice within the NLRB's domain, the court and the NLRB possess concurrent jurisdiction to decide the case. *See Smith v. Evening News Ass'n*, 371 U.S. 195, 197, 83 S.Ct. 267, 268, 9 L.Ed.2d 246 (1977).

Because this appeal involves a question of law, we exercise plenary review. *See Medical Fund—Philadelphia Geriatric Center v. Heckler*, 804 F.2d 33, 36 (3d Cir.1986).

### A.

■ In order to resolve this dispute, we first must examine the interplay between the jurisdiction of the NLRB and of the federal district courts in labor cases. Under the preemption doctrine in labor law, state and federal courts must defer to the primary jurisdiction of the NLRB if a matter is arguably subject to section 7 or sec-

tion 8 of the National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 151–169 (1982).[6] *Garmon*, 359 U.S. at 244, 245, 79 S.Ct. at 779, 780; *see also Longshoremen v. Davis*, 476 U.S. 380, 381, 389–90, 106 S.Ct. 1904, 1907, 1911–12, 90 L.Ed.2d 389 (1986). A primary reason for the preemption doctrine is "the need to avoid conflicting rules of substantive law in the labor relations area and the desirability of leaving the development of such rules to the administrative agency created by Congress for that purpose...." *Vaca v. Sipes*, 386 U.S. 171, 180–81, 87 S.Ct. 903, 912, 17 L.Ed.2d 842 (1967). The doctrine reflects the congressional intent that matters of national labor policy be decided in the first instance by the NLRB. *See Garmon*, 359 U.S. at 244–45, 79 S.Ct. at 779–80; *see also Longshoremen v. Davis*, 476 U.S. at 391, 106 S.Ct. at 1912.

This policy is especially important where Congress has granted the NLRB initial authority to decide issues such as representation, bargaining units, *see International Brotherhood of Elec. Workers, Local 532 v. Brink Const. Co.*, 825 F.2d 207, 211 (9th Cir.1987), a party's status as an "employee" within the meaning of the NLRA, *see Iron Workers v. Perko*, 373 U.S. 701, 706, 83 S.Ct. 1429, 1431, 10 L.Ed.2d 646 (1963), or union governance of its membership, *see Plumbers & Pipefitters v. Plumbers & Pipefitters*, 452 U.S. 615, 626, 101 S.Ct. 2546, 2552, 69 L.Ed.2d 280 (1981). *See generally* American Bar Association, *The Developing Labor Law* 377–78 (2d ed., 3d supp. 1988) (listing areas of the NLRB's exclusive and primary jurisdiction). Those issues involve "considerations ... largely of a kind most wisely entrusted initially to the agency charged with the day-to-day administration of the Act as a whole." *Marine Engineers v. Interlake Steamship Co.*, 370 U.S. 173, 180, 82 S.Ct. 1237, 1241, 8 L.Ed.2d 418 (1962).

---

5. Mack alleged in its complaint that the UAW attempted to repudiate the new agreement. The district court specifically found a breach by repudiation.

6. Section 7 of the NLRA regulates the right of employees to organize and to engage in collective bargaining. 29 U.S.C. § 157. Section 8 prohibits employers and unions from committing unfair labor practices, which are defined in that provision. 29 U.S.C. § 158.

■ Nevertheless, the preemption doctrine "has never been rigidly applied to cases where it could not fairly be inferred that Congress intended exclusive jurisdiction to lie with the NLRB." *Vaca*, 386 U.S. at 179, 87 S.Ct. at 911. In § 301 of the LMRA, Congress "carved out" an exception to the NLRB's exclusive jurisdiction, by granting district courts jurisdiction over suits for violations of contracts between an employer and a labor organization representing employees in an industry affecting commerce. *Id.* The NLRB's primary jurisdiction does not preempt a court's jurisdiction over § 301 actions, even if the matter is arguably subject to § 7 or § 8 of the NLRA. In *Smith*, 371 U.S. at 197, 83 S.Ct. at 268, the Supreme Court held:

> The authority of the Board to deal with an unfair labor practice which also violates a collective bargaining contract is not displaced by § 301, but it is not exclusive and does not destroy the jurisdiction of the courts in suits under § 301.

*Id.; see also Farmer v. Carpenters Local 25*, 430 U.S. 290, 297 n. 8, 97 S.Ct. 1056, 1062 n. 8, 51 L.Ed.2d 338 (1977) (§ 301 is a congressional exception to NLRB's exclusive jurisdiction under *Garmon* ); *William E. Arnold Co. v. Carpenters Dist. Council*, 417 U.S. 12, 16, 94 S.Ct. 2069, 2072, 40 L.Ed.2d 620 (1974) ("[T]he *Garmon* doctrine is not relevant to actions within the purview of § 301....") (citations omitted).

Thus, a district court retains independent jurisdiction to decide a case properly brought under § 301, even if the claim may also constitute an unfair labor practice under the NLRA. "The strong policy favoring judicial enforcement of collective-bargaining contracts was sufficiently powerful to sustain the jurisdiction of the district courts over enforcement suits even though the conduct involved was arguably or would amount to an unfair labor practice within the jurisdiction of the National Labor Relations Board." *Hines v. Anchor Motor Freight*, 424 U.S. 554, 563, 96 S.Ct. 1048, 1055, 47 L.Ed.2d 231 (1976); *see also Motor Coach Employees v. Lockridge*, 403 U.S. 274, 300, 91 S.Ct. 1909, 1924, 29 L.Ed. 2d 473 (1971). In *Smith*, for example, when a clause of a collective bargaining agreement specifically prohibited discrimination against union members, the fact that an action for breach of contract based on that provision could also constitute an unfair labor practice claim under § 8(a)(3) of the NLRA, 29 U.S.C. § 158(a)(3), did not destroy the court's jurisdiction over the contract suit. 371 U.S. at 200–01, 83 S.Ct. at 270. In such a case, the NLRB and the court possess concurrent jurisdiction. *See id.* at 197, 83 S.Ct. at 268; *see also NLRB v. Strong*, 393 U.S. 357, 360, 89 S.Ct. 541, 544, 21 L.Ed.2d 546 (1969).

### B.

A labor case, therefore, can be within the concurrent jurisdiction of the NLRB and the federal courts, but it is within the NLRB's exclusive jurisdiction only if it involves an unfair labor practice that is not also covered by § 301(a). Thus, the NLRB's jurisdiction is "exclusive" only if there is no jurisdiction under § 301(a). On the other hand, a case is governed solely by § 301(a) only if it is not also an unfair labor practice. Under each jurisdictional scenario, the applicability of § 301(a) controls our inquiry.

The UAW, however, contends that we need not reach the § 301(a) issue in this case because Mack's suit is solely an NLRB matter, *i.e.*, not a contract claim, and is therefore within the NLRB's exclusive jurisdiction. *See* American Bar Association, *The* Developing Labor Law 377 (2d ed., 3d supp. 1988) ("Courts have recognized exclusive or primary Board jurisdiction in suits involving primarily representational matters and matters which are unfair labor practices under the Act as distinct from contractual issues."); *accord Local 3–193 Intern. Woodworkers v. Ketchikan Pulp Co.*, 611 F.2d 1295, 1299 (9th Cir.1980) (union attempted end run around the NLRB by characterizing its representation and bargaining unit claim as a contract action under § 301).

The UAW relies on the general proposition that the NLRB has authority to oversee and referee the process of collective

bargaining. *See H.K. Porter Co. v. NLRB,* 397 U.S. 99, 107–08, 90 S.Ct. 821, 825–26, 25 L.Ed.2d 146 (1970). Further, it contends that Mack's claim implicates the NLRA's duty to bargain collectively, and in good faith, *see* §§ 158(a)(3), (a)(5), and the duty to reduce the terms of an oral contract to writing, *see* § 158(d).

We disagree. First, as we have noted, we cannot resolve the UAW's claim that Mack's suit is exclusively a NLRB matter without also determining that the suit is not a § 301(a) action. Thus, by adopting the UAW's exclusivity argument, our holding would necessarily reject Mack's claim that we have jurisdiction under § 301(a) to determine the existence of a contract. If, however, we hold that § 301(a) does cover Mack's suit, the *Garmon* preemption doctrine would not apply, and—even assuming Mack's claim also alleges an unfair labor practice—the NLRB and the court would possess concurrent jurisdiction. *See Smith,* 371 U.S. at 197, 83 S.Ct. at 268.

■ Therefore, the NLRB's authority to supervise the collective bargaining process does not by itself preempt a federal court's jurisdiction to decide a § 301 contract dispute. Indeed, the NLRB has declined to exercise its concurrent jurisdiction over unfair labor practice questions when federal labor policy would best be served by judicial treatment. *See id.* at 198 n. 6, 83 S.Ct. at 269 n. 6; *accord William E. Arnold Co.,* 417 U.S. at 18, 94 S.Ct. at 2073 (1974) ("The Board's practice and policy of declining to exercise its concurrent jusisdiction over arguably unfair labor practices which also violate provisions of collective-bargaining agreements for voluntary adjustment of disputes highlight the congressional purpose that § 301 suits in state and federal courts should be the primary means for 'promoting collective bargaining that [ends] with agreements not to strike.' ") (quoting *Lincoln Mills,* 353 U.S. at 453, 77 S.Ct. at 916).

■ Second, we do not find that Mack's suit turns solely on violations of good faith bargaining, or the duty to execute an agreement, *see* §§ 158(a)(3), (5), (d), which would trigger the NLRB's exclusive jurisdiction. Mack's complaint does not request that the union be ordered to execute an agreement. *Compare NLRB v. New York–Keansburg–Long Branch Bus Co.,* 578 F.2d 472, 474, 479 (3d Cir.1978) (union filed unfair labor practice charge alleging that employer had refused to sign an agreement that had been reduced to writing). Nor did Mack claim that the UAW negotiated in bad faith or failed to bargain. Rather, Mack seeks to enforce the validity of a contract. Although this claim may raise some unfair labor practice issues,[7] we must first determine whether § 301(a) grants federal courts jurisdiction to determine the existence of a collective bargaining agreement. If it does, our inquiry is complete because even if NLRB issues are implicated, the concurrent jurisdiction doctrine vests the district court with jurisdiction.

### C.

■ In construing § 301(a), our starting point is the language of the statute. The precise meaning of "suits for violation of contracts" in § 301(a) is unclear, and Congress did not define it in the LMRA. The phrase could assume the existence of a valid labor agreement, and refer only to suits for a breach of a specific contractual provision, or it could grant jurisdiction to resolve a dispute over whether the parties' conduct constituted the formation of a contract. That, of course, is the issue presented in this appeal.

Because the statutory provision is not free from ambiguity, we interpret § 301(a) in light of its legislative history, congressional intent, and underlying policies. *See Northern R.R. Co. v. Oklahoma Tax Comm'n,* 481 U.S. 454, 107 S.Ct. 1855,

---

**7.** To establish that the conduct at issue was "arguably" subject to the NLRA, the party asserting preemption based on the NLRB's exclusive jurisdiction "must advance an interpretation of the Act that is not plainly contrary to its lan- guage and that has not been 'authoritatively rejected' by the courts or the Board." *Long- shoremen v. Davis,* 476 U.S. at 395, 106 S.Ct. at 1914.

1859–60, 95 L.Ed.2d 404 (1987) ("Legislative history can be a legitimate guide to a statutory purpose obscured by ambiguity."); *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 220–22, 106 S.Ct. 2485, 2494, 91 L.Ed.2d 174 (1986); *cf. Complete Auto Transit, Inc. v. Reis*, 451 U.S. 401, 406, 101 S.Ct. 1836, 1840, 68 L.Ed.2d 248 (1981) ("[I]t is clear that in fashioning federal [substantive] law under § 301(a) substantial deference should be paid to revealed congressional intention.") (citing *Atkinson v. Sinclair Refining Co.*, 370 U.S. 238, 248–49, 82 S.Ct. 1318, 1324–25, 8 L.Ed.2d 462 (1962)).

During the past three decades, the Supreme Court has thoroughly canvassed the policies and history underlying enactment of § 301(a). Although this legislative history has been described as "somewhat cloudy and confusing," *Textile Workers v. Lincoln Mills*, 353 U.S. 448, 452, 77 S.Ct. 912, 915, 1 L.Ed.2d 972 (1957), we believe Congress offered "a few shafts of light that illuminate our problem." *Id.*

First, Congress enacted § 301 to expand, not limit, the availability of forums for the enforcement of contracts made by labor organizations. *Dowd Box Co. v. Courtney*, 368 U.S. 502, 508–09, 82 S.Ct. 519, 523, 7 L.Ed.2d 483 (1962). Until passage of § 301, enforcement of labor agreements had been a task handled by state courts, *William E. Arnold Co.*, 417 U.S. at 20, 94 S.Ct. at 2074, even though many states had made "suits against labor organizations difficult or impossible." *Dowd Box Co.*, 368 U.S. at 510, 82 S.Ct. at 524. Passage of the Act "represented a far-reaching and many-faceted legislative effort to promote the achievement of industrial peace through encouragement and refinement of the collective bargaining process." *Id.* at 509, 82 S.Ct. at 523. Critical to this goal was Congress' recognition in § 301 "of the vital importance of assuring the enforceability of such agreements" in the courts. *Id.*

Second, we find it instructive that the legislation originally proposed in Congress would have made the violation of a collective bargaining agreement an unfair labor practice, subject to NLRB jurisdiction, and also made it a § 301 contract violation, subject to federal court jurisdiction. *Id.* at 510–11, 82 S.Ct. at 524–25; *accord Lincoln Mills*, 353 U.S. at 452, 77 S.Ct. at 915. "In conference, however, it was decided to make collective bargaining agreements enforceable only in the courts." *Dowd Box Co.*, 368 U.S. at 511, 82 S.Ct. at 524. Congress intended that collective bargaining contracts should be enforceable, and that an aggrieved party should "have a right of action in Federal courts." *Lincoln Mills*, 353 U.S. at 453, 77 S.Ct. at 916. Congress noted:

> Once parties have made a collective bargaining contract, the enforcement of that contract should be left to the usual processes of the law and not to the National Labor Relations Board.

H.R.Conf.Rep. No. 510, 80th Cong., 1st Sess. 42 (1947), U.S.Code Cong.Serv. 1947, pp. 1135, 1147; *see also Plumbers & Pipefitters*, 452 U.S. at 626, 101 S.Ct. at 2552; *Dowd Box Co.*, 368 U.S. at 511, 82 S.Ct. at 524; *Lincoln Mills*, 353 U.S. at 452–53, 77 S.Ct. at 915–16. In addition, Congress made clear that

> [section 301] contemplates not only the ordinary lawsuits for damages but also such other remedial proceedings, both legal and equitable, as might be appropriate in the circumstances; in other words, proceedings could, for example, be brought by the employers ... under the Declaratory Judgments Act in order to secure declarations from the Court of legal rights under the contract.

93 Cong.Rec. 3656 (1947) (statement of Rep. Barden), *quoted in Lincoln Mills*, 353 U.S. at 456, 77 S.Ct. at 917.[8] Thus, Congress designated the judiciary as the body charged with "assuring the enforceability of such agreements." *See Dowd Box Co.*, 368 U.S. at 509, 82 S.Ct. at 523.

We have considered whether these legislative pronouncements might presume the existence of a valid agreement and thereby

---

**8.** Rep. Hartley, a co-sponsor of the bill, confirmed this interpretation. 93 Cong.Rec. 3657 (1947) (statement of Rep. Hartley), *quoted in Lincoln Mills*, 353 U.S. at 456, 77 S.Ct. at 917.

contemplate § 301 jurisdiction only when the parties agree that a contract exists. This view, however, ignores Congress' broader concern that the courts—as opposed to the NLRB—be granted authority to decide disputes of a contractual nature. When, as here, a party seeks enforcement of a labor agreement, and the other party denies the contract's existence, the filing party's declaratory judgment action constitutes an "enforcement" action. Congress intended that contractual disputes be resolved by courts applying "usual processes of the law." H.R.Rep. 510 at 42, U.S.Code Cong.Serv. 1947, at 1147. These principles of law apply equally to cases involving breach of an acknowledged contract and those involving a dispute over the agreement's existence.

Moreover, by declining to classify contract violations as an unfair labor practice under the Act, Congress determined that contract actions did not necessarily implicate the type of labor issues that mandated initial referral to the specialized expertise of the NLRB. Instead, Congress expressed a preference for judicial, as opposed to agency, resolution of contractual questions, and it recognized a declaratory judgment action as a proper means of obtaining this type of judicial relief.

The Court's decision in *Dowd Box Co.* supports our holding of jurisdiction. In *Dowd Box Co.*, the parties began contract negotiations before expiration of a labor agreement. They then signed a stipulation continuing the existing agreement and providing for wage increases and changes concerning holidays and vacations. The employer announced that it would honor the stipulation, but a few weeks later changed its mind. The employer contended it had informed the union during negotiations that the employer's bargaining agents had acted without authority in negotiating the stipulated agreement. The union subsequently filed suit in state court, requesting "a judgment declaring that there existed a valid and binding collective bargaining

agreement. . . ." 368 U.S. at 504, 82 S.Ct. at 521.[9]

The issue decided by the Supreme Court was whether § 301 divested state courts of jurisdiction in contract violation cases and thereby granted federal courts exclusive jurisdiction. *Id.* at 503, 506, 82 S.Ct. at 520, 522. The Court held that a state court could assert jurisdiction over a § 301 suit seeking a declaration that a contract existed, as long as it applied federal law. *Id.* at 511, 82 S.Ct. at 524; *accord Teamsters Local, 174 v. Lucas Flour Co.*, 369 U.S. 95, 102, 82 S.Ct. 571, 576, 7 L.Ed.2d 593 (1962) (inconsistent state law must give way to substantive federal labor law). The Court's analysis recognized that a suit seeking a declaration that a contract existed fell within the ambit of § 301(a). By addressing whether state courts could also assert jurisdiction in such cases, the Court implicitly recognized that federal courts already possessed the same authority under § 301 to entertain declaratory judgment suits over the existence of a bargaining agreement. *See Dowd Box Co.*, 368 U.S. at 511, 82 S.Ct. at 524 ("The clear implication of the entire record of the congressional debates in both 1946 and 1947 is that the purpose of conferring jurisdiction upon federal district courts was not to displace, but to supplement, the thoroughly considered jurisdiction of the courts of the various states over contracts made by labor organizations.").

We are presented with nearly identical facts in this case. After commencing negotiations before expiration of an existing agreement, the UAW and Mack publicly announced a "tentative agreement" on April 23, 1987, and the UAW members ratified the new agreement. When the UAW later refused to acknowledge the agreement as controlling, Mack filed suit in federal court seeking a declaratory judgment that "the April 23, 1987 Agreement with the International Union constitutes a valid and enforceable collective bargaining

---

**9.** Specifically, the union's complaint requested a judgment declaring that there existed a valid and binding collective bargaining agreement, for an order enjoining the company from terminating or violating, and for an accounting and damages.
*Dowd Box Co.*, 368 U.S. at 504, 82 S.Ct. at 521 (describing averments in the complaint).

agreement...." *See* Complaint at 24. Mack's request for relief is indistinguishable from the union's claim in *Dowd Box Co.* *Compare* n. 3, *supra*, (Mack's complaint) *with* n. 9, *supra*, (*Dowd* complaint).

If, as the UAW contends, § 301(a) does not confer jurisdiction to determine the existence of a contract, the Court in *Dowd Box Co.* would have had no occasion to reach the issue whether state courts could also possess jurisdiction in such cases. Moreover, the Court has recently applied the *Dowd Box Co.* analysis in discussing the distinction between the respective roles of the federal courts and the NLRB. In *Plumbers & Pipefitters v. Plumbers & Pipefitters*, 452 U.S. 615, 626, 101 S.Ct. 2546, 2552, 69 L.Ed.2d 280 (1981), the Court recognized the "obvious and substantial difference" between the NLRB's substantive regulation of internal union affairs and the "enforcement by the federal courts of freely entered into agreements...." In discussing the issue of federal court jurisdiction, the Court reaffirmed the principle that *"enforcement* of [a collective bargaining agreement] should be left to the usual processes of the law and not to the National Labor Relations Board." *Id.* (emphasis in original) (quoting H.R.Rep. 510 at 42, U.S.Code Cong.Serv. 1947, at 1147; *Teamsters Local, 174 v. Lucas Flour Co.*, 369 U.S. 95, 101 n. 9, 82 S.Ct. at 575 n. 9 (1962)

(citing *Dowd Box Co.*, 368 U.S. at 513, 82 S.Ct. at 525)).

Finally, prior decisions of this court do not support the UAW's view that a district court lacks jurisdiction under § 301 to determine the existence of a collective bargaining agreement. In *Leskiw v. Local 1470, International Bhd. of Elec. Workers*, 464 F.2d 721 (3d Cir.), *cert. denied*, 409 U.S. 1041, 93 S.Ct. 526, 34 L.Ed.2d 490 (1972), we held a district court lacked jurisdiction under § 301 unless the plaintiff alleges a violation of a collective bargaining agreement. *Id.* at 723. We distinguished between suits for "a violation *of* a collective bargaining agreement" and suits for "an alleged violation *by* a labor contract" of rights that employees already possessed under a pre-agreement "'contract of hire.'" *Id.* (quoting *Adams v. Budd Co.*, 349 F.2d 368, 369–70 (3d Cir.1965) (emphasis in original)). We held that a party cannot invoke § 301 jurisdiction by alleging that the contract itself constituted a violation by conflicting with other pre-existing rights. *Accord Medlin v. Boeing Vertol Co.*, 620 F.2d 957, 962 (3d Cir.1980) (no jurisdiction under § 301 because plaintiff's claim was independent of the contract, and did not involve a violation of rights arising under a collective bargaining agreement). In *Leskiw*, we did not address the issue whether § 301 grants jurisdiction for courts to decide whether a contract exists.[10]

---

**10.** We recognize that some courts of appeals have read the language of § 301 as barring jurisdiction to address this question, *see, e.g., A.T. Massey Coal Co. v. Int'l Union*, 799 F.2d 142, 146 (4th Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 1964, 95 L.Ed.2d 536 (1987); *NDK Corp. v. Local 1550*, 709 F.2d 491, 492–93 (7th Cir.1983); *Hernandez v. Nat'l Packing Co.*, 455 F.2d 1252, 1253 (1st Cir.1972), but we disagree with those holdings.

In *A.T. Massey Coal Co.*, for example, the Fourth Circuit considered a consolidated appeal in which one district court had declined to assert jurisdiction over whether a contract existed in a suit filed by an employer, and another district court asserted jurisdiction under the same facts in a suit filed by the union. The court held that under § 301 a district court had no jurisdiction to consider an employer's claim that it was not bound by an agreement because no contract existed. The court then concluded, however, that the second district court had § 301 jurisdiction to consider the union's claim that the em-

ployer was bound by the same agreement. 799 F.2d at 146. This view fails to articulate a legal basis to justify jurisdiction in the union case, but not in the employer's case.

The Courts of Appeals for the Seventh and First Circuits, meanwhile, merely concluded that the plain language of § 301 bars jurisdiction to consider a suit concerning the existence of a collective bargaining agreement. *See NDK Corp.*, 709 F.2d at 492–93; *Hernandez*, 455 F.2d at 1253. Other courts have disagreed. *See, e.g., Rozay's Transfer v. Local Freight Drivers, Local 208*, 850 F.2d 1321, 1326 (9th Cir.1988); *McNally Pittsburg, Inc. v. International Ass'n of Bridge, Structural & Ornamental Iron Workers*, 812 F.2d 615, 617–19 (10th Cir.1987); *Board of Trustees v. Universal Enter.*, 751 F.2d 1177, 1184 (11th Cir. 1985); *United Steelworkers of Amer. v. Rome Indus., Inc.*, 437 F.2d 881, 882–83 (5th Cir.1970). In *McNally*, for example, the court held that § 301 grants a district court jurisdiction to consider whether a labor contract exists because the statute's dual purposes "to promote industri-

Accordingly, we conclude that § 301(a) confers jurisdiction on a district court to determine the existence of a collective bargaining agreement.

## III.

■ The UAW also maintains that notwithstanding subject matter jurisdiction under § 301, the district court is barred from deciding this case because the same dispute is pending under the mandatory grievance procedure in the 1984 agreement, which the UAW invoked when it filed a grievance on July 2, 1987. Thus, the UAW contends that Mack has failed to exhaust its contractual remedies.

Under Article 32, section 2 of the 1984 agreement, negotiations for modification or amendment of the agreement are not binding unless those changes have been reduced to writing and signed by designated parties. Article 5 of the 1984 agreement provides for an exclusive grievance procedure for all employee disputes involving contract interpretation. The UAW maintains that its grievance alleges that Mack unilaterally implemented modifications to the 1984 agreement, in violation of Article 32. Because this grievance awaits arbitration, the UAW contends that Article 5 bars Mack from bringing suit in the district court.

On its face, the UAW's July 2 grievance seems to challenge Mack's implementation of the new agreement.[11] It does not implicate Article 32 of the 1984 agreement.[12] Because Article 32 governs negotiations to

modify or amend the 1984 agreement, it does not apply to the negotiations conducted in April, 1987, which were directed only to the creation of a new labor contract. Moreover, the grievance procedure under Article 5 governs employee disputes only, under the interpretation of the 1984 agreement. It does not bear on the existence of a new agreement.

Thus, Article 5 of the 1984 agreement is an employee-oriented grievance procedure and as such, the grievance procedures set forth in that Article apply solely to grievances by union members and not grievances by Mack.[13] The district court could not have been deprived of jurisdiction purely on the basis of a grievance procedure aimed at resolving employee grievances. As a result, the UAW's argument that Mack should "exhaust contractual remedies" before bringing an action under § 301 is meritless. *See Lehigh Portland Cement Co. v. Cement, Lime, Gypsum & Allied Workers Division,* 849 F.2d 820, 822–23 (3d Cir.1988).

For these reasons, we conclude that the mandatory grievance procedure under the 1984 agreement did not bar this action in federal court.

## IV.

After deciding that it had jurisdiction to hear this case, the district court concluded: "A new master collective bargaining agreement exists between Mack and the Union effective May 4, 1987, until November 3, 1992. The terms of this master bargaining

---

al peace and develop uniform law, demand that the statute be construed broadly." 812 F.2d at 617–19.

Although we agree with those authorities that have upheld jurisdiction in the district court to decide the existence of a labor contract, we prefer to rest our conclusion on the analysis set forth in text, *supra* Part II–C.

**11.** For the text of this grievance, see *supra* note 2.

**12.** In a draft submitted to Mack on May 1, 1987, the UAW expressed its understanding of the parties' intent:

Notwithstanding Article 32 of the Master Shop, Office and Engineering Agreements [*i.e.,* the 1984 agreement], the New Agreement

will have an effective date of 12:01 a.m., May 4, 1987....

App. at 1114. The UAW first raised Article 32 as a bar to the new agreement's enforceability in a letter to Mack dated July 6, 1987—four days after the UAW had filed its grievance. App. at 751.

**13.** Article 5 provides in relevant part:

In the event that any employee has a grievance or any group of employees have a grievance, the employee having such grievance or the group having a grievance or a designated member thereof shall, before a written grievance is filed pursuant to Section 2 below, take up the grievance in the following manner:
....

agreement are set forth in plaintiff's exhibit 80 as modified by this opinion and by the record in this case." 671 F.Supp. at 1036.[14] We review this determination under a mixed standard. To the extent the district court made factual findings on the terms of the contract, we cannot disturb those findings unless they are clearly erroneous. To the extent the court selected or interpreted legal principles, our review is plenary. *Universal Minerals, Inc. v. C.A. Hughes & Co.,* 669 F.2d 98, 103 (3d Cir.1981).

## A.

■ In determining whether a collective bargaining agreement exists, courts must look to federal labor relations law,

not state contract law. *See Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 211, 105 S.Ct. 1904, 1911, 85 L.Ed.2d 206 (1985); *Lincoln Mills,* 353 U.S. at 451, 77 S.Ct. at 915. In order to reach a labor agreement, the parties must establish a meeting of the minds, *see Bobbie Brooks, Inc. v. International Ladies' Garment Workers' Union,* 835 F.2d 1164, 1168 (6th Cir.1987), and demonstrate that the parties agreed on the substantive terms and conditions of the contract. *New York–Keansburg–Long Branch Bus Co.,* 578 F.2d 472, 477 (3d Cir.1978).

■ In the field of labor relations, the technical rules of contract law do not

**14.** In its opinion, the district court summarized the essential elements of the agreement as set forth in Mack's exhibit 17, a report prepared on April 24, 1987, by Walter Meck, a Mack official and negotiator, for the members of Mack's Board of Directors:

(a) A five and one-half year term, effective immediately following ratification;

(b) A commitment by Mack that during the term of the new master agreement it will not close any existing facilities at which work is being performed by members of the Union (other than the previously announced closing of the Allentwon assembly division);

(c) The assignment to Mack's Macungie facility of its complete knockdown operations and the assembly of all of its cab over engines models, its glider kits, and the "Baby 8" model;

(d) No further outsourcing by Mack during the term of the agreement;

(e) The implementation by Mack of its five year capital investment program of $22,000,-000 for the Macungie assembly division and $100,000 for the Hagerstown power train division;

(f) The company's consent to fund and implement the *special early retirement benefits program* as defined in the 1984 master agreement, as to all eligible Mack union employees;

(g) The maximum term of health care benefits currently provided to laid off employees to be extended from 13 months to 24 months for Mack's active union employees laid off as a result of the previously announced closing of the Allentown assembly division and the outsourcing of miscellaneous machining and carriers at the Hagerstown power train division;

(h) A reduction of $.85 to $1.10 per hour to be made to the wage rate schedule;

(i) Productivity improvements of up to twenty percent (20%) to be implemented at Macungie, effective on the date of the start up of the "Baby 8" model or January 4, 1988 (which-

ever is later), and Hagerstown, effective June 8, 1987;

(j) Job security guarantees for members of Local 677's engineering unit and the placement of the proposed centralized computer center in the Lehigh Valley, if constructed during the term of the new master agreement;

(k) The creation of a Protected Employee Group ("PEG") program, replacing the current Mack Income Security ("MIS") Program, with a $33,000,000 "bank" of funds to be used to offset the impact of future events such as improved methods of doing business, new technology and market turndowns exceeding ten percent (10%) of PEG employment levels (such levels to exclude the impact of 5C and other plant closings, Hagerstown outsourcing, productivity improvement improvements, and the higher than normal current employment levels due to the strike bank and current market conditions) [sic];

(*l*) The grievances concerning employee transfer to Winnsboro and the Union's entitlement to automatic recognition at Winnsboro to be subject to an "accelerated" arbitration process on May 5th and 6th, 1987;

(m) Certain supplemental unemployment benefits claims, currently unfunded, to be funded;

(n) Scheduled pension increases to occur during the term of the new contract;

(*o*) The scheduling of wage improvements of $.15 per hour effective January 1, 1990, 1991, and 1992;

(p) A health care cost containment program to be implemented as quickly as possible;

(q) Group insurance benefits to be improved throughout the term of the contract;

(r) A program of company funded lump sum payments to be established in return for voluntary terminations of employment.

671 F.Supp. at 1029–30. The opinion also listed several revisions to which both parties had agreed. *See id.* at 1035–36.

determine the existence of an agreement. *See John Wiley & Sons, Inc. v. Livingston,* 376 U.S. 543, 550, 84 S.Ct. 909, 914, 11 L.Ed.2d 898 (1964); *Bobbie Brooks,* 835 F.2d at 1168; *Pepsi–Cola Bottling Co. v. NLRB,* 659 F.2d 87, 89 (8th Cir.1981). Adoption of an enforceable labor contract does not depend on the reduction to writing of the parties' intention to be bound. *Bobbie Brooks,* 835 F.2d at 1168;[15] *American Fed'n of Television & Radio Artists v. Inner City Broadcasting Corp.,* 748 F.2d 884, 887 (2d Cir.1984); *Trustees of Atlantic Iron Workers, Local 387 Pension Fund v. Southern Stress Wire Corp.,* 724 F.2d 1458 at 1459 (11th Cir.1983); *Kaylor v. Crown Zellerbach, Inc.,* 643 F.2d 1362, 1367 (9th Cir.1981); *New York–Keansburg–Long Branch Bus Co.,* 578 F.2d at 477. Instead, courts look to the surrounding circumstances and to the parties' "conduct manifesting an intention to abide by agreed-upon terms." *Bobbie Brooks,* 835 F.2d at 1168 (citing *NLRB v. Haberman Constr. Co.,* 641 F.2d 351, 355–56 (5th Cir. 1981) (en banc)); *see also Operating Eng'g Pension Trust v. Gilliam,* 737 F.2d 1501, 1504 (9th Cir.1984). The parties' objective intent to create a contract is relevant—not their subjective beliefs. *See Warehouseman's Local No. 206 v. Continental Can Co.,* 821 F.2d 1348, 1350 (9th Cir.1987).

### B.

■ The UAW contends that it never reached an agreement with Mack, and therefore that the district court erred in finding a meeting of the minds. After reviewing the record, we conclude that the court correctly found that the parties entered into a new collective bargaining agreement.

From the time of the conclusion of the Crystal City negotiations, the UAW's conduct demonstrated a meeting of the minds on the new labor agreement. In the early morning hours of April 23, 1987, Usery and representatives for Mack and the UAW ended the bargaining session with a "handshake meeting," congratulated each other on reaching a new agreement, and discussed forthcoming ratification plans. As the district court found, such conduct generally signifies the culmination of an agreement. *See, e.g., Bobbie Brooks,* 835 F.2d at 1169 (agreeing with district court's reasoning that the "tone and temperament of the parties at the conclusion of the ... meeting suggested that a binding agreement had been reached....").

More significantly, on May 3, 1987, an overwhelming majority of the affected UAW members voted to ratify the new agreement. Union ratification is generally considered to be "the last act necessary ... to create a meeting of the minds and an enforceable agreement." *NLRB v. Deauville Hotel,* 751 F.2d 1562, 1569 n. 10 (11th Cir.1985); *see also NLRB v. Southern Fla. Hotel,* 751 F.2d 1571, 1581 n. 14 (11th Cir. 1985) (parties created an enforceable contract upon rank-and-file ratification, even though document provided it would become valid upon execution).

After ratification, there was a compelling sign of accord at the televised press conference in Allentown on May 4, 1987, where Governor Casey, along with representatives of Mack and the UAW, publicly announced the formation of a new agreement. Officials of the UAW stated unequivocally that they had entered into a new labor agreement with Mack. Tom Natchuras, the International UAW's Regional Director, praised the contract's emphasis on employee participation:

> Here at Mack Truck we have in the agreement a provision for employee involvement and we will work at that very earnestly. We will couple the skills, knowledge, resources of the management personnel along with the skills, knowledge and resources of the men and women in the bargaining unit and together I'm sure that a year or so from now

---

**15.** Indeed, in *Bobbie Brooks,* the employer brought a § 301 declaratory judgment action to determine whether a collective bargaining agreement existed. *See Bobbie Brooks, Inc. v. International Ladies' Garment Workers' Union,* 835 F.2d 1164 (6th Cir.1987). The Sixth Circuit reached the merits without discussing a potential jurisdictional problem concerning the propriety of district courts hearing such suits under § 301.

we will look back at this day and say I'll be darned, we really did it.

App. at 1081 (transcript of press conference). Kim Blake, president of UAW Local 677, thanked the International UAW for its involvement in the negotiating process:

> [W]e never lost sight of the fact that we couldn't do it without the International. We missed out on the boat in the January discussions and came up with a better agreement.... So I think this is the beginning of a new relationship with Mack and the UAW....

App. at 1083–84. In response to a reporter's questions, Blake expressed his satisfaction with the terms of the new contract:

> [T]he most complimentary thing that was said to us was by Bill Usery who told us this was one of the best, if not the best, labor agreement in the country with regard to job security and that's got to be the No. 1 issue in any job marketplace.

App. at 1096–97. Thus, the ratification vote, supported by the words and conduct of UAW officials, provide overwhelming evidence that the parties reached a meeting of the minds as of April 23, 1987.

The UAW contends that notwithstanding this evidence, the district court erred in finding that the parties reached an agreement. First, the UAW points out that the court itself recognized that a dispute remained as to "whether certain step increases in pension benefits are to apply to persons who retire after January 1, 1987, or only to those who retire after January 1, 1988." 671 F.Supp. at 1035. The court directed the parties to "negotiate this issue in good faith." Id. The UAW contends this holding was internally inconsistent and violated the policies underlying the NLRA.

It is true that, as a general matter, "a contract does not arise if the union and management have not resolved a dispute over a substantive term." *Bobbie Brooks*, 835 F.2d at 1168. In this case, however, the parties never discussed the issue of step increases in pension plans during the negotiations at Crystal City. *See* 671 F.Supp. at 1035. The dispute over that term never arose until trial. Moreover, the district judge found that this provision was not a "material," "essential," or "operative" term of the agreement. *Id.* We have no reason to overturn this factual finding. Where a new contract is not contingent upon resolution of a specific issue, that issue does not require resolution before a collective bargaining agreement can be formed. *See Georgia Kraft Co., Woodkraft Div. v. NLRB*, 696 F.2d 931, 937 (11th Cir.1983), *vacated in part on other grounds*, 466 U.S. 901, 104 S.Ct. 1673, 80 L.Ed.2d 149 (1984).

The UAW also argues that substantial differences between the parties after the ratification vote prove the absence of agreement. In particular, the UAW cites a document prepared by Mack and submitted to the UAW on June 2, 1987, entitled "Subject Areas of Disagreement." App. at 2000–04. The UAW maintains that this document reveals differences between the parties as to the substantive terms negotiated in Crystal City.

In its opinion, the district court comprehensively addressed these contentions. First, it resolved several minor disputes that did not affect the validity of the new agreement. For example, the parties initially disagreed over the date of observing Martin Luther King's birthday, but at trial they agreed to observe it on the designated national holiday. 671 F.Supp. at 1034 n. 3. In addition, the court retained in the new agreement the UAW's proposed guidelines regarding the quality of worklife. Id. at 1035. The court also found that disagreements over other issues did not involve substantive differences, but rather concerned contract language or attempts to modify the new agreement. For example, at trial the parties disagreed over the interpretation of the language governing the funding of Mack's supplemental unemployment benefit plan. The court ordered the parties to resolve that dispute through the grievance and arbitration procedures. More importantly, the court found that the language disputes involving the UAW's greatest concerns—outsourcing and continued production at certain sites—should be resolved in favor of the UAW. 671 F.Supp.

at 1035.[16] The fact that the parties later attempted to modify the terms of the new contract does not mean that they never reached a binding agreement. *See Granite State Distrib., Inc.*, 266 N.L.R.B. 457, 461 (1983) (Subsequent efforts to modify terms are "in no way inconsistent with the existence of the previously arrived-at agreement. It is not unusual for parties to an agreement to discuss its terms, or even to seek modification thereof, after the agreement has been arrived at.").

### V.

For the foregoing reasons, we hold that the district court had subject matter jurisdiction to consider this case, and that the grievance and arbitration procedure under the 1984 agreement did not bar Mack's claim. We also hold that the court correctly found that a new collective bargaining agreement existed between the parties. Accordingly, we will affirm the judgment of the district court.

Costs taxed against appellant.

---

16. Mack has filed a motion under Fed.R.Civ.P. 60(a) to remand to the district court for clarification of the record because of certain inconsistencies between the district court's October 9, 1987 order and its October 26, 1987 opinion. Under Rule 60(a), a court may correct "[c]lerical mistakes in judgments, orders or other parts of the record and errors therein arising from oversight or omission...."

In its October 9 order, the court stated that the UAW's exhibit 7, as modified, would govern outsourcing and transfer of work. In its October 26 opinion, however, the court cited Mack's exhibit 23 as controlling. Because these exhibits contain some inconsistencies, the discrepancy between the order and the opinion involves more than a clerical mistake and is therefore outside the scope of Rule 60(a). *See Jones v. Anderson–Tully Co.*, 722 F.2d 211, 212 (5th Cir. 1984); *Gilbreth Int'l Corp. v. Lionel Leisure, Inc.*, 645 F.Supp. 732, 734 (E.D.Pa.1986) (Rule 60(a) errors "must be mechanical in nature, apparent on the record and not involve and error of substantive judgment."). We therefore will deny Mack's motion.

It may be possible, however, to resolve these discrepancies under Fed.R.Civ.P. 60(b)(1) particularly since the issue raised is collateral to the question whether a new agreement came into existence—an issue that we have resolved on this appeal. The Advisory Committee Note to the 1946 amendment to Rule 60(b) explains that Rule 60(b)(1) permits relief based on the mistake or inadvertence of others, including the court itself. Thus, if either party or both of them so desire, there is nothing to prevent Mack or the UAW from proceeding before the district court under Rule 60(b)(1).